(No. 63438.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BRIAN JOHNSON, Appellant.

*Opinion filed April 20, 1989.*

Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago (Richard E. Cunningham, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Kenneth T. McCurry, Kevin Sweeney and Lynda A. Peters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Brian Johnson, was charged by indictment in the circuit court of Cook County with one count

of intentional murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)), two counts of knowing murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)), three counts of felony murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)), two counts of attempted murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—4)), seven counts of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2), four counts of aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a)), three counts of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)), one count of theft (Ill. Rev. Stat. 1983, ch. 38, par. 16—1), and one count of unlawful restraint (Ill. Rev. Stat. 1983, ch. 38, par. 10—3(a)). These charges stemmed from an incident in which one man was killed, two others were wounded and personal property was taken from them. The defendant entered a plea of not guilty and, after a bench trial, was found guilty of all of the charges. The trial court rendered a factual finding that the defendant had committed the murder in the course of an armed robbery. A death sentence hearing was held and the defendant again waived a jury. The court found that there existed one or more of the factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)(c)) and there existed no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentence was stayed (107 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). The defendant was also sentenced to serve 30 years for each of the two counts of attempted murder, 30 years for each of the two counts of armed violence, 15 years for each of the three counts of armed robbery, four years for theft, and three years for unlawful restraint. The remaining counts were all merged.

At trial, the State presented the following evidence. The defendant and the three victims, Frederick Foss, Arthur Hinshaw, and Ellis Worley, all worked together

at a Goodyear Tire store in Chicago. The defendant was employed as a mechanic. Hinshaw was the manager of the store and four or five years previously had taken part in hiring the defendant. In early October 1984, the defendant was late in attending a Goodyear training program in Elgin, and on October 10, 1984, Hinshaw fired him.

October 19, 1984, was a regular weekly payday for Goodyear employees. At the time the defendant had at least one week's vacation pay accumulated. According to Hinshaw, Goodyear policy provided that monies owed to discharged employees would not be disbursed at the store, but would instead be sent from Akron to the employee's residence. At 5:30 p.m. on October 19, the defendant entered the service area of the Goodyear store and spoke to two other mechanics, Robert Johnson and Harvey Ellis. Worley was also in the service area at this time, although Hinshaw and Foss were not. The defendant asked Johnson and Ellis if his tools were still there. When they replied that they were, the defendant said he would return the next day to get them, and then left the store.

The defendant returned 10 minutes later. Worley, Hinshaw and Foss were all there, about to leave. According to Worley's testimony at trial, the defendant was holding a gun. The defendant said to the three men: "You are not going anywhere." He then said to Hinshaw, either: "You fired me, didn't you," or: "Art, you fired me." He then shot Hinshaw and Foss. Both victims fell to the floor. Worley testified that Hinshaw and Foss were shot twice. The defendant then ordered Worley to get down on the floor, and Worley complied.

Worley saw the defendant walk over to Hinshaw and take his wallet. He also saw the defendant approach Foss, but did not see him take anything from his body. The defendant then approached Worley and asked him

what had been done with the money. Worley replied that they had not taken it to the bank, but had left it in the safe. The defendant told Worley to get up and come with him into the office area of the store, where the safe was located. The safe was locked, however, and the two returned to the service area.

The defendant ordered Worley to give him his money. Worley emptied his pocket, placing nine dollars and change on a table. The defendant then asked him whether that was all he had. When Worley affirmed that it was, the defendant told him to hand over the keys to his car, and Worley complied. The defendant then told Worley to get on the floor. When he had complied, the defendant shot Worley for the first time, through the hand which Worley was clasping to the top of his head. The bullet also grazed his scalp. Worley rolled over and the defendant shot him again. The defendant went through Worley's pockets and took $120 from him. As the defendant was leaving, he apparently saw Worley move. Saying, "Oh, you are still moving," the defendant stabbed Worley in the left side with a knife. Worley testified that the defendant took the knife from the inside of the green army jacket the defendant was wearing. Worley had never seen the knife at work before. Defendant then left the store through the back door, returning only briefly to turn out the lights.

Hinshaw's testimony differed in some respects from Worley's. According to Hinshaw, the defendant only said one word, "stop," before shooting Hinshaw once, hitting him in the stomach. Hinshaw heard Foss pleading with the defendant, telling him to stop and saying, "You don't have to go to these extremes." Hinshaw heard a shot and Foss fell to the floor beside him. He could hear Foss breathing. He heard the defendant say to Worley, "He's going to tell." The defendant walked over to Foss and shot him a second time, searching his pockets after he

had done so. The defendant then shot Hinshaw a second time, afterwards taking his wallet, which contained approximately $100.

According to the medical evidence, Foss died of two gunshot wounds to the chest. Worley was treated for a severe stab wound in his abdomen, and gunshot wounds to his left chest, scalp, and right hand. A bullet was removed from his left arm. Hinshaw had two gunshot wounds, one to his stomach and one to his upper left arm. The bullet which pierced his stomach remains lodged in his backbone.

Shortly after the shootings, Officer Joseph Danzl and his partner were assigned to look for the defendant and for Worley's car. Later that night, the officers responded to a call telling them the car had been seen on South Michigan Avenue, three blocks from the store. They arrived there and arrested the defendant and a companion sitting in the car.

After the defendant's arrest, a green army jacket and $68 were taken from him. After being given his *Miranda* warnings, the defendant told the officers that he had placed the gun under a green carpet on the rear patio of a house on South Coles Avenue. The gun was recovered there on October 20.

On October 20, the defendant gave the police a written statement, which was admitted into evidence. According to the statement, the defendant was owed two weeks' pay when he was fired by Hinshaw. He waited for his money until the next payday, October 19, and then called Hinshaw at about 3 p.m. When he asked if his paycheck was in, Hinshaw replied, "What paychecks, I don't have no paycheck for you," and hung up.

The defendant went to the store at 5:45 p.m. but left without getting his money. When he returned, he pointed a gun at Hinshaw and asked him for the money. Hinshaw replied, "Get out of here, you young punk. You

don't have enough heart to shoot, drop one right now." The defendant then shot Hinshaw twice and Foss twice. He went to the office but found that the safe was locked. After he returned he asked Worley if Worley would "tell on him," and Worley said yes. He then shot Worley twice. He took wallets from all three men and Worley's car keys. After leaving, he returned to the store at about 9 p.m. and took Worley's car.

The defendant presented no evidence in his own behalf. The defendant raises only one challenge to the guilt-innocence phase of his trial. He claims that he was denied effective assistance of counsel because his attorney's theory of defense was to concede guilt to the murder of Frederick Foss, but not to the armed robbery and felony murder charges. This theory was based on the view that the evidence of guilt for the murder charge was overwhelming, but that the defendant would not be eligible for the death penalty if it was established that the murder did not occur in the course of a felony.

At trial, the defendant was represented by two privately retained attorneys. The theory of defense became clear during opening statement when counsel stated that "the issue in this case is not whether or not Brian Anthony Johnson committed a murder, it is whether or not in the course of a felony did he commit murder." Counsel proceeded in his opening statement by setting forth his view of what the evidence would show. This version was consistent with the defendant's confession and his testimony at the sentencing hearing. On a number of occasions counsel stated that the defendant would testify; however, he was not called to testify at the guilt stage of the trial, though he did testify at the sentencing hearing.

Counsel explained that the defendant had worked at Goodyear for four years prior to the killings. He was initially good friends with all of the victims, including

Arthur Hinshaw, with whom he enjoyed a relationship which was "almost father-son-like." Sometime during Christmas of 1983, this relationship began to sour when the two had a disagreement over the purchase of a transmission for the defendant's car. The defendant was entitled to an employee discount for the transmission but only received it after a dispute with Hinshaw, which was resolved in defendant's favor after he complained to Hinshaw's superiors.

The defendant on several occasions attended Goodyear training sessions in Elgin, Illinois. According to counsel's opening statement, in October of 1984, defendant arrived one day late for a training session because of problems with his car. When the defendant attempted to enroll at the training session, he was told that he could only be admitted with Hinshaw's permission. Hinshaw, however, told the operators of the school to send the defendant back to work. When he returned to work, Hinshaw fired him. After his firing, the defendant contacted the zone manager and inquired about the pay that was due to him and whether he could be transferred to another store.

Counsel proceeded by stating that on Friday October 19, payday at Goodyear, the defendant awoke at 10:30 a.m. and began to drink alcohol. The zone manager had told him that he was entitled to a paycheck that day, but when he called the store Hinshaw told him he had no paycheck for him and hung up. However, he still planned to go to the store to see about his check. On the way to the store he met a friend, "L.C.," a drug dealer. The two went to a "dope house," where they spent the afternoon using alcohol, cocaine, and marijuana laced with the drug "PCP." Late in the afternoon, realizing that Goodyear was about to close, he proceeded to the store. He carried with him a gun which he kept for protection while traveling on public transportation, but no knife.

Defense counsel claimed the defendant would testify that his "only intention that day *** was to go to Goodyear and get his due, and that was the checks that were due and owing to him that the zone manager told him were owing to him at the Goodyear Tire."

Counsel stated that when the defendant first went to the store he saw the three victims, but other people were in the store so he left. He then went across the street to buy some beer, yet when he reached the checkout counter he realized he had no money. He told the cashier to "hold his beer" while he went across the street, intending to collect his check and to cash it at a nearby currency exchange. At the store, Hinshaw, Foss and Worley were alone and defendant asked for his check. Hinshaw said he had no money for him, and defendant pulled out his gun. Hinshaw remarked that he was a punk and did not have the nerve to shoot. The defendant then fired upon the three men.

Counsel concluded his opening statement by saying:

> "The evidence will show that Mr. Johnson did no act of theft, no act of armed robbery, no act of taking from the person of any of these people until after he had fired and killed Frederick Foss. ***
>
> Judge, the issue in this case is not whether or not a murder was committed. The issue is whether or not a felony murder was committed.
>
> And I feel confident that, at the close of the evidence, the court will find that Mr. Johnson did not commit a felony murder. And that he is guilty of other things, but he did not commit a felony murder.
>
> And I respectfully request the Court to enter such a finding."

Though defendant presented no evidence on his own behalf during the guilt-innocence phase of the trial, during the course of trial, counsel did cross-examine each of the State's witnesses, attempting to elicit that the defendant did not enter the store with the intent to rob

any of the victims. Counsel cross-examined Ellis Worley in regard to his relationship with the defendant and also as to what happened on the day of the shooting. He was able to elicit that Worley never saw the defendant take any items of personal property from Foss. While cross-examining the arresting officer, counsel questioned him concerning conversations he had with the defendant and he introduced the defendant's confession. Much of the confession corroborated the theory that he did not go to the store with the intent to harm or rob anyone, but only to get his paycheck. During cross-examination of Hinshaw, he elicited that Foss had on him the daily receipts—$900 in cash and a number of checks—at the time of the shooting but defendant did not take any of that money.

Defense counsel began his closing argument by stating, "Your Honor, we did admit in our opening statement that Brian Johnson committed murder." He then argued that the defendant had not intended to rob any of the victims until after he had shot Frederick Foss, pointing out that he never asked any of the victims for any money and did not take the $900 in cash that was found in Foss' pockets. He concluded by stating:

> "Nowhere in any part of the State's case did they state, or prove beyond a reasonable doubt that Brian Johnson attempted to commit an armed robbery in the commission of the shooting upon the three individuals. That was an afterthought. *** [T]he State cannot show a felony murder application here."

The defendant contends, on appeal, that this defense denied him effective assistance of counsel. In *People v. Albanese* (1984), 104 Ill. 2d 504, 526, we adopted the standard for competence of counsel set out in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In the first part of this two-part test, the defendant must prove that his counsel made errors

so serious, and his performance was so deficient, that he was not functioning as the "counsel" guaranteed the defendant by the sixth amendment of the United States Constitution. Second, he must prove these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable. (466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The Court emphasized that scrutiny of counsel's performance must be highly deferential and "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) It warned that intensive scrutiny "and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

There are exceptional circumstances where the two-part test need not be applied. In *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, the Court stated that where "counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (Emphasis added.) (466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.) In some instances, ineffectiveness of counsel will be established without application of the *Strickland* test. As examples, the Court remarked that where there has been a complete denial of counsel or denial at a critical stage then prejudice need not be established, but instead will be presumed. (466 U.S. at 658-59, 80 L. Ed. 2d at 667-68, 104 S. Ct. at 2046-47.) The Court in *Strickland* also made reference to such circumstances. It stated that

where the State interferes with counsel's assistance or where counsel is burdened by an actual conflict of interest then prejudice need not be shown. *Strickland,* 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067.

In a recent case, this court has forsaken the two-part test and found that the *Cronic* and *Strickland* presumption standard was met. (*People v. Hattery* (1985), 109 Ill. 2d 449.) The defendant's ineffective-assistance-of-counsel argument relies mainly on *Hattery. Hattery* was a jury trial in which the defendant received the death penalty for the murder of a mother and her two children. The evidence showed the defendant stood guard over, and eventually murdered, the victims while a codefendant attempted to obtain drugs from the woman's husband. The defendant confessed to the murders, explaining that the codefendant had instructed him to kill the victims and that the codefendant had threatened to harm the defendant and his family if he disobeyed.

Counsel in *Hattery* on a number of occasions conceded defendant's guilt and that he was eligible for the death penalty. In his opening statement, counsel stated:

> " 'We are not asking you to find Charles Hattery not guilty. At the end of your deliberations, you will find him guilty of murder. We are asking you to consider the evidence that you hear today and in the next few days to explain why he did the horrible thing that he did. Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you, will be whether to impose the death penalty on Charles Hattery for trying to save the life of his family.' " 109 Ill. 2d at 458-59.

Counsel thus made an unequivocal concession to the murder charge, the only charge brought against the defendant. Moreover, counsel stated that the defendant should be found eligible for the death penalty, relieving the jury from that decision as well. Throughout the guilt-

innocence phase of the trial, counsel advanced no theory of defense, presented no evidence of their own, made no closing argument and made no attempt to hold the State to its burden of proof. Rather, counsel attempted to show, in cross-examination, that the defendant's actions were the product of compulsion. Because compulsion is not a defense to a charge of murder, but is a mitigating factor sufficient to preclude imposition of the death penalty, counsel was apparently attempting to develop during the guilt-innocence phase a theory which would prove helpful in preventing the death penalty at the sentencing phase.

In *Hattery*, we held that the defense counsel's representation did not subject the prosecution's case "to the 'meaningful adversarial testing' required by the sixth amendment," and granted a new trial regardless of the overwhelming proof of guilt. (109 Ill. 2d at 464, quoting *United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045.) In reaching this conclusion, *Hattery* relied on a number of cases where ineffectiveness was presumed when it was clear that the counsel's theory was contradictory to the defendant's position. (See *Francis v. Spraggins* (11th Cir. 1983), 720 F.2d 1190 (the defendant, charged with murder, took the stand and denied knowledge of the crimes, but his counsel conceded defendant's guilt to the jury); *People v. Fischer* (1982), 119 Mich. App. 445, 326 N.W.2d 537 (defendant testified in support of an insanity defense, but counsel asked for a finding of guilty but mentally ill); *State v. Uplinger* (Minn. 1984), 343 N.W.2d 858 (during cross-examination of a State witness, counsel effectively conceded defendant's involvement in the offense, to which the defendant voiced his objection).) One of the goals in *Hattery*, and the cases it relied upon, was to prevent counsel from undermining the defense preferred by the client by conceding guilt. To promote this goal we

strongly condemned the practice of conceding guilt after a not-guilty plea was entered unless the defendant's consent to this concession is shown on the record. The defendant argues that *Hattery* held that ineffective assistance of counsel is automatically established whenever counsel concedes defendant's guilt to the main offense, though a plea of not guilty was entered.

Though *Hattery* condemned the practice, we did not in that case hold that it is *per se* ineffectiveness whenever the defense attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt but fails to show on the record consent by defendant. This would be especially true when counsel presents a strong defense to the other charges. (*People v. Weger* (1987), 154 Ill. App. 3d 706, 710.) The examples given in *Cronic* and *Strickland* for when ineffectiveness was established without an inquiry into prejudice were clearly instances where the defendant's sixth amendment right to counsel was violated and such violation could not be tolerated regardless of prejudice. Likewise, in *Hattery* it was clear that the representation fell below acceptable standards and prejudice need not have been established.

We decline to read *Hattery* as broadly as the defendant urges. The error caused by counsel's concession stems from no fault of the State. Nor can the error be easily cured by the prosecutor or the trial court. If we were to accept an automatic ineffectiveness rule, there would be the danger that an unscrupulous defense attorney, especially in a death penalty case, would deliberately concede his client's guilt in order to lay the groundwork for a later reversal. It is even possible that client and counsel would conspire to this end. For these reasons the rule in *Hattery* must be narrowly construed. (See *People v. Emerson* (1987), 122 Ill. 2d 411, 430 (*Hattery* did not apply because counsel did not unequivocally concede guilt).) Thus, if a concession of guilt is made, inef-

fectiveness may be established; however, the defendant faces a high burden before he can forsake the two-part *Strickland* test.

We do not believe that the facts in this case establish that counsel entirely failed to subject the prosecution's case to meaningful adversarial testing such that the *Cronic* standard is met or, as the defendant argues, that they fall squarely within the facts of *Hattery*. It was admitted that the defendant killed Frederick Foss, shot the other victims and took personal property. However, with two of the victims living to testify and a confession by the defendant, the evidence as to these acts was overwhelming. In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists. Though concession of the murder was made, going to trial did preserve for the defendant matters that a guilty plea necessarily would have waived. Counsel did not concede each element of attempted murder, felony murder, armed violence, aggravated battery, armed robbery, theft and unlawful restraint. Instead counsel argued that the State must meet its burden of proof beyond a reasonable doubt and that it was unable to do so, especially as to the felony murder charge. Unlike *Hattery*, counsel did not abandon "even the pretense" of defending his client. There was asserted a theory of defense to a number of charges, not just a theory of mitigation, and this theory was pursued during opening and closing arguments and during cross-examination. Also, the attorneys for defendant vigorously contested that the defendant was eligible for the death penalty, whereas in *Hattery* the attorney conceded this issue. Lastly, as to obtaining the defendant's consent on the record, this case does not fall within the holding of those cases relied on in *Hattery* where a reversal was neces-

sary after it became clear that the theory of defense was contradicted by the actions of the defendant.

Because prejudice may not be presumed, we must apply the *Strickland* test to determine if there has been ineffective assistance. Claims of ineffective assistance of counsel may be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding the first prong, whether the errors were serious enough to constitute less than reasonably effective assistance. (*Strickland,* 446 U.S. at 976, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) Under the second prong of *Strickland* the defendant must show that there is a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) The defendant argues that even assuming that it was reasonable to use the guilt phase of the trial to convince the court that the defendant was not eligible for the death penalty, counsel was incompetent in neglecting to have the defendant testify in favor of that contention at that stage of the trial. Assuming, without deciding, that this decision was in fact incompetent, we do not believe to a reasonable probability that the trial court would have found the defendant not guilty of the felony murder charge if the defendant had testified at trial. Two of the three victims survived to testify at trial, and their testimony was sufficient to establish beyond a reasonable doubt that defendant committed the crimes for which he was convicted. They testified that the defendant shot each of them and Foss twice, stabbed Worley once, ordered Worley to turn over his money and car keys, and searched Hinshaw and Foss' body and took money from them. Each of the eyewitnesses had worked with defendant prior to the incident, so there was no question as to the identity of the gunman. Moreover, the substance of defendant's testimony at the sen-

tencing hearing was admitted at trial via his confession, and it essentially corroborated the other witnesses' testimony. We cannot therefore conclude to a reasonable probability that the court would have acquitted the defendant had it heard his testimony.

. The defendant next raises a number of challenges to his sentencing hearing.

After the defendant's conviction, the State moved for a death penalty hearing. The defendant waived a jury for both the eligibility and death penalty phases. At the eligibility hearing, the parties stipulated to the testimony presented during trial. The trial court found that because the defendant was over 18 years old at the time of the shooting and had committed the murder in the course of a forcible felony, armed robbery, he was eligible for the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

Before the second phase of the death penalty hearing, defendant again waived his right to a jury. The State relied for aggravation upon the evidence adduced at trial, and also introduced by stipulation evidence that the defendant had been arrested in 1982 for unlawful use of weapons, for which he had received and completed a term of court supervision. The defendant's motion *in limine* to bar the State from using this evidence was overruled.

The defendant presented the following evidence in mitigation. The defendant's mother testified that the defendant was the youngest of four children. She had separated from the defendant's father when the defendant was four years of age. She supported her children by working at a variety of jobs and was a computer operator at the time of the hearing. The defendant's mother also testified that the defendant had been a "good boy" when he was growing up, that he had never been involved in fights and gangs, and that he had not been in

trouble with the police as a juvenile or after high school. He received above-average grades in high school and graduated after four years. While in high school, he worked for Goldblatt's, and after high school for Goodyear.

The defendant had moved away from his mother's house a couple of months before the shooting, and his mother had not seen him for two or three weeks prior to the shooting. She was not aware that he had been fired, and expressed no knowledge of his alleged alcohol and drug problems. She stated her belief that he would learn from his mistakes.

Russell Thomas, a friend of the defendant's family, stated that he had known the defendant for 20 years. He testified that the defendant was obedient, nonviolent, and truthful. Similar testimony was received from Addy Peterson, the best friend of the defendant's mother, and Dianne Nelson, a friend and neighbor of the defendant.

Gala Watson, who had been the defendant's girlfriend from 1981 until 1983, also testified. She stated that the defendant drank with his friends, but never in her presence. He never got into fights, carried a gun, lied or cheated. She described him as "nice," "sensitive," "very energetic," and "outgoing." She testified that she thought he would learn from his mistakes and, if ever released from prison, would be a useful member of society. Gala Watson's sisters, Jacqueline Thompson and Sharlon Smith, testified to much the same effect. They described the defendant as "lovable and understanding," "a sweet person," and someone who "always wanted to help someone else."

Apart from the defendant's friends and neighbors, one of the defendant's victims, Ellis Worley, also testified on his behalf. Worley testified that he had worked with the defendant for two years before the shooting. During that time, he had never known the defendant to get into

fights or arguments. The defendant was a peaceful person. He also considered the defendant his friend, as were Frederick Foss and Arthur Hinshaw. Worley testified that the defendant should "serve the time that's given. But I wouldn't go for the death penalty" for this crime. On cross-examination, he stated that if he had died and Foss had survived, he would have wanted Foss to request that the defendant not be given the death penalty.

The defendant testified in his own behalf. He stated that his father left the family in 1977 or 1978. In addition to the facts attested to by his mother, he stated the following. After Goldblatt's went out of business, he was hired by Arthur Hinshaw to work for Goodyear. He and Hinshaw got along very well and he considered him a "father figure." After Ellis Worley began to work at the store, the defendant became close to him, and also considered him a father figure. He was not as close to Frederick Foss, but found him to be a nice, friendly man. During his career at Goodyear, the defendant twice attended and successfully completed two-week training programs in Elgin.

According to the defendant, an incident in December 1983 changed his relationship with Hinshaw. On that date, Hinshaw sold the defendant a transmission for his car. He charged him the regular customer price. The defendant afterwards learned from his co-workers that he had been overcharged because he was entitled to an employee discount as well as pay for the time it took him to change the transmission. The defendant received these benefits only after calling the company auditor and his union representative. Hinshaw refused to speak to the defendant after this incident. The defendant began to receive reprimands from Hinshaw for being absent or tardy. On one occasion Hinshaw accused the defendant of stealing tires and tried to have him fired. The defend-

ant was suspended for two days, but after Hinshaw completed an inventory and learned that no tires were in fact missing, the defendant was reinstated and Hinshaw apologized to him.

The defendant was scheduled to begin a third training course in Elgin in early October 1984. He arrived one day late. The training instructor called Hinshaw, who told him not to admit the defendant to the program and to send him back to Goodyear. When the defendant returned to Goodyear, Hinshaw told him he was fired. The defendant contacted the district manager and his union representative, and they assured the defendant that they would look into the matter.

On October 19, 1984, the defendant awoke about noon. He drank a considerable amount of beer and smoked a marijuana cigarette. He felt high from this point on for the rest of the day. He then called Goodyear and spoke to Frederick Foss. Foss told him the checks were in, and the defendant told him that he would come to the store to get his check. While waiting for a bus, the defendant was picked up by a drug dealer he knew only as "L.C." The defendant was carrying his .32 revolver "for protection," because he sometimes encountered problems taking public transportation late at night.

"L.C." took the defendant to a "dope house" in the Roseland neighborhood, close to Goodyear Tire. The defendant remained at the dope house using drugs from 2 p.m. to about 5:15 p.m. The defendant used cocaine, marijuana and PCP. He also drank whiskey and beer. The drugs and alcohol made him feel high, lazy, and blurry. The defendant suddenly realized that it was after 5 p.m., and he hurried to Goodyear to try and get his check.

When he arrived in the service area, two fellow mechanics, Robert Johnson and Harvey Ellis, told him that the front part of the store was already locked and that it

was too late for him to get his check. The defendant then went across the street to a liquor store, but when he went in to buy a beer, he discovered he had no money left. He then returned to the Goodyear store and saw Hinshaw, Foss, and Worley just getting ready to leave.

When Hinshaw saw the defendant he said, "What the *** are you doing here?" The defendant replied: "I have got to have my money. I need my check." Hinshaw then said: "You don't have any *** check, get the hell out of here." The defendant said he was not leaving until he got his check. He drew his gun, hoping that the drawn gun would compel Hinshaw to give him the check. Hinshaw said: "You don't have enough *** guts, young punk. Let me see you drop one. Get the heck out of here."

According to the defendant, he began to shoot at that point. Up until the time he started shooting, and after, he did not intend to rob any of the victims. He testified that he only intended to get his check, and that he looked for it in the front of the store. When he could not find his check there, he went through the pockets of the men to see if any of them had it. He then took their wallets. He had no recollection of any other details once he started shooting. He testified that he had no knife when he entered the store, and stated that the knife used to stab Worley was a knife he had seen in the shop.

After he left the shop, he drove with Aron Younger in his car back to his house on South Cornell Avenue. They continued to smoke marijuana and drink. The defendant then discovered that he had car keys. He realized that they belonged to Worley's car. He returned to Goodyear and he and Younger took Worley's car. They were discovered by the police later that night sleeping in the car several blocks from Goodyear. The defendant gave his statement to the police the following day.

The defendant apologized in court to Hinshaw and Worley and to the family of Frederick Foss. He said that he would give his life if it would bring Foss back. The defendant stated that he understood that he would have to pay for what he had done but that he did not want to die. A presentence report was also admitted into evidence. The report contained statements by the defendant that he had a serious drug and alcohol problem.

The defendant first argues that his death penalty was harsh and excessive as a matter of law. He contends that in light of his youth, family background, employment history, lack of prior convictions, emotional problems, and drug and alcohol dependency his death sentence should be vacated. The State argues that his actions showed he acted coherently and with a plan. He brought a gun and knife with him and used them to obtain the victims' personal belongings. The defendant deliberately shot each man twice, despite his past relationship with them and their pleading. He attempted to conceal the act by returning to turn out the lights, and when he returned to take Worley's car he did not render aid to any of the victims. The defendant also acknowledged that he was often tardy or absent, and this may have contributed to his firing. The State also contests his assertions that he was addicted to drugs and alcohol.

In enacting the death penalty statute, our legislature did not intend that every defendant who qualifies should receive the sanction; there is a certain amount of discretion in imposing the sentence, and this court has automatic authority to review any death penalty imposed. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i).) In reviewing the propriety of a death sentence, our analysis is guided by the principle that "in capital cases the fundamental respect for humanity underlying the eighth amendment 'requires consideration of the character and record of the individual offender and the circumstances of the par-

ticular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " (*People v. Carlson* (1980), 79 Ill. 2d 564, 590, quoting *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) Where a murder for which the defendant has been convicted seems to be an aberration brought on by special circumstances, which in all likelihood will not be repeated, neither the deterrent nor retributive functions of the death penalty are served.

The defendant argues his case compares favorably with others in which we found the death penalty to be inappropriate (*People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Crews* (1969), 42 Ill. 2d 60; *People v. Walcher* (1969), 42 Ill. 2d 159), though he relies mainly on *Buggs* and *Carlson.* In *Buggs,* the defendant was a man in his forties with no prior criminal record. He had a drinking problem, and during the period just before the offense, he had been drinking particularly heavily. His wife had continually asked him for a divorce, which he refused to grant; he instead attempted to persuade her to work out their problems. She had begun entertaining various boyfriends at their home when the children were present. On the day in question, one of his wife's boyfriends persistently telephoned, which led to their final argument. During that argument, the defendant's wife told him that he was not the father of their two sons. It was at this point the defendant became outraged, poured gasoline on his wife and the stairs and lit a match. In the ensuing blaze the defendant's wife and two of his children died. At trial, the defendant's expert testified that defendant suffered from "Isolated Explosive Disorder," a single discrete episode in which the defendant's failure to resist an impulse led to an externally directed act that had a catastrophic impact on others.

In *Carlson*, the defendant was also in his forties and had no prior criminal record. In the two years prior to committing the two murders, he "deteriorated physically and emotionally." He had suffered two heart attacks, a cerebral concussion, and other injuries. Shortly before the murders, the defendant's wife obtained a divorce; they had been married for 19 years. The defendant testified he had agreed not to contest the divorce on the condition that his wife not entertain men at the house. After the divorce, the defendant and his wife continued to see each other and, according to the defendant, planned to remarry. The defendant's wife postponed the wedding, however, and later told the defendant that she would not be seeing him as frequently as before because she had a boyfriend. Several days later, after having dinner with his wife, and having been told other details about her boyfriend, the defendant shot his wife 10 times with a gun he had purportedly bought for protection. The defendant then poured gasoline throughout three rooms and set fire to the house. After killing his wife, the defendant gave several thousand dollars to a friend to convey to his children, and sat down to drink in a bar. As four police officers approached him in the bar, the defendant fired a number of shots, killing one officer. The defendant presented psychiatric testimony that at the time of the offense he was undergoing a slow grieving process related to the loss of the affection of his wife, and that he was extremely distraught when he killed the officer. The defendant received a prison term for the murder of his wife and the death penalty for the murder of the officer, which we reversed.

*Buggs* and *Carlson* pointed out a number of important factors the court should consider in determining if the death sentence is appropriate. In each case there was the presence of two statutory mitigating factors: no significant history of prior criminal activity (Ill. Rev.

Stat. 1983, ch. 38, par. 9—1(c)(1)) and action under extreme mental or emotional disturbance (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2)). The court also found important that the defendants had led relatively blameless lives and that the circumstances which prompted the incidents were unique and tragic and ones which were not likely to be repeated in the future. Though both instances involved murders of a wife, we do not agree with the State that the holdings are necessarily confined to crimes against family members. In fact, Carlson was sentenced to death for the killing of the police officer, not his wife.

Though these cases are helpful in making our determination, each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty. We do not believe that the circumstances of this crime and the character of this defendant speak of a man who deserves to be sentenced to death. A number of witnesses testified to the defendant's good character. He was not known to be violent or untruthful. He never had any gang involvement, and he was caring, friendly and helpful to the people who knew him. The defendant attended public schools in Chicago. He completed high school in four years, receiving grades of mostly B's and C's. The defendant had no juvenile record and had received only one misdemeanor unlawful possession of a weapon charge, for which he successfully completed supervision. While in high school he worked at Goldblatt's tire center. When they went out of business, he got a mechanic's job at Goodyear Tire, where he worked for over four years. His work record was good, though he was often tardy or late, which he blames on his drug and alcohol use. He claims to have

had a good relationship with Hinshaw, his superior, until he was wrongly accused of stealing tires and was improperly denied an employee discount in the purchase of a transmission. The defendant expressed remorse to the victims and to the family of Foss. He attributes much of his behavior to his chemical dependency and the loss of his job.

There is no disputing the seriousness of the crimes committed, but this record does not show that the defendant is the type of person who should be permanently eliminated from society. (*People v. Carlson* (1980), 79 Ill. 2d 564, 590.) The defendant had no significant prior criminal record. The fact that he received and completed supervision for the one criminal offense in his life attests to his rehabilitative potential. Another attestation to this came from one of the victims, Ellis Worley, who stated that he did not believe the defendant should be put to death. In fact, he stated that if he, instead of Foss, had died, he would want Foss to argue that death is not appropriate.

Besides the defendant's criminal history, another important mitigating factor is whether the crime occurred under extreme emotional disturbance. Though we decline to equate the loss of a job with marital difficulties, this event nonetheless appears to have caused the defendant a good deal of stress, which in his mind may have been equal to that suffered by the defendants in *Buggs* and *Carlson*. The defendant was a young man who took pride in the fact that he was steadily employed during high school and for the 4½ years afterwards as a mechanic. His work relationship at Goodyear began well but deteriorated in the last year, mainly as a result of two instances, both being resolved in his favor and only after a significant ordeal. And after being fired, he was still concerned enough about his job to complain to the supervisors and to seek a transfer. On the day of the incident,

it was payday and the defendant had been told that there was a paycheck for him. His outburst appears to have occurred after the man who fired him, Hinshaw, said that there was no check. Even after the shooting his actions of searching each man for his check and not taking the $900 in cash and the checks from Foss indicate he believed there was a check there for him and that was what he was looking for. Contrary to the State's argument, these actions are no more planned and coherently acted out than in *Buggs* or *Carlson*.

The defendant argues that his drug and alcohol problem parallels those of other defendants whose death sentences were vacated, and he blames his behavior on the addiction. We do not agree that this is an important factor, one which should be given considerable weight. The defendant's drugged and intoxicated condition on that day may partially explain his actions but it does not excuse them. Furthermore, the only evidence in support of this claim is the defendant's un-cross-examined statements in the sentencing report; none of his own character witnesses testified to having knowledge of his drinking or drug abuse.

Nonetheless, we do agree that this defendant has led a relatively blameless life except for this one explosive episode. We also agree that the retributive and deterrent functions of the death penalty will not be served by putting him to death; rather he should be required to serve a prison sentence and then be given an opportunity to return to society and lead a productive and peaceful life, as he has demonstrated he can. Therefore, we remand this matter for a new sentence other than death.

The defendant raises a number of other issues regarding his sentencing hearing; however, we only need to address the one which may arise at the new hearing. During the second phase of the sentencing hearing, the State introduced as evidence that in 1982 the defendant

received one year of court supervision after pleading guilty to the offense of unlawful use of a weapon. According to defense counsel, supervision was successfully completed. This evidence may, as noted earlier, be viewed in two ways. Successful completion of supervision may be viewed as a nonstatutory mitigating factor which attests to a defendant's rehabilitative potential. The defendant, however, argues that introduction of this weighed unfavorably in the determination of his sentence. Furthermore, he contends that our supervision statute precludes the use of a charge dismissed under its provisions as an aggravating factor and that it was therefore improper for the trial court to consider the charge. *People v. Wunnenberg* (1981), 85 Ill. 2d 188.

The Illinois death penalty statute provides that, during the second phase of the sentencing hearing, "[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c).) Section 9—1(e) states that "[a]ny information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e).

We have repeatedly interpreted these provisions to provide that in determining admissibility the only finding necessary is that the evidence be relevant and reliable. (*People v. Free* (1983), 94 Ill. 2d 378, 422; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.) The rules of evidence do not restrict what the court may consider in its determination of the appropriate sentence to impose. (*People v. Meeks* (1980), 81 Ill. 2d 524, 535.) Evidentiary rules are relaxed at this stage because it is vital that the sentencing authority have before it the fullest information

possible regarding the defendant's life, character, criminal record and the circumstances of the particular offense. *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083; *People v. Owens* (1984), 102 Ill. 2d 88, 111; *People v. La Pointe* (1981), 88 Ill. 2d 482, 496.

Adhering to the principle that the State and defendant have considerable leeway in the presentation of relevant evidence as long as it is also reliable, we have allowed the introduction of a variety of evidence relating to criminal conduct. *People v. Richardson* (1988), 123 Ill. 2d 322, 362 (evidence of seven offenses for which defendant was arrested but not convicted); *People v. Owens* (1984), 102 Ill. 2d 88, 112-13 (testimony concerning defendant's post-trial attack on a correction officer, details of prior crimes and evidence of prior juvenile adjudications); *People v. Owens* (1984), 102 Ill. 2d 145, 160 (evidence of defendant's misconduct as a juvenile); *People v. Free* (1983), 94 Ill. 2d 378, 424 (testimony concerning defendant's suspicious conduct one day before the incident); *People v. Bey* (1972), 51 Ill. 2d 262, 267 (proof of pending indictment).

At this stage of the sentencing hearing, the admissibility of evidence relating to the defendant's criminal propensity clearly is not limited to convictions. In *La Pointe* we allowed the State to present evidence of prior misconduct for which the defendant was not prosecuted or convicted. We held that the conduct "was relevant to a determination of a proper sentence in that it bore upon the likelihood or unlikelihood that defendant would commit other offenses; it appeared trustworthy; defendant had the opportunity to face and cross-examine the witness; and the accuracy of the information was not challenged." *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.

Under the *La Pointe* test, the evidence presented in aggravation against Johnson was admissible. The defendant pleaded guilty in 1982 to the unlawful use of a weapon, and he received, and successfully completed, a one-year supervision. The crimes of which he was found guilty in 1986 also involved the use of a firearm, and the 1982 charge is relevant as a reflection on the defendant's character and criminal propensity. It should be noted that this was presented at the sentencing hearing, where, unlike the guilt-innocence phase of the trial, the evidentiary rule prohibiting evidence of one's criminal propensity does not apply. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 517.) The evidence was stipulated to, and neither its trustworthiness nor accuracy was challenged. It was presented through the testimony of Officer Eberly, and defendant had the opportunity to face and cross-examine him.

The defendant argues, however, that our supervision statute precludes consideration of the offense in a later forum. He argues that the statute is identical to the Federal Youth Corrections Act and in *People v. Wunnenberg* (1981), 85 Ill. 2d 188, we held that a conviction set aside pursuant to that act should not be considered as an aggravating factor for a defendant convicted of unlawful delivery of a controlled substance. We do not believe that *Wunnenberg* is controlling in this situation. The statute in *Wunnenberg* was the Federal Youth Corrections Act. It allowed the court to "suspend the imposition or execution of sentence and place the youth offender on probation." (18 U.S.C. §5010(a) (1964).) Further, it provided that:

> "Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall

issue to the youth offender a certificate to that effect." 18 U.S.C. §5021(b) (1964).

In interpreting the Act we found a clear consensus of opinion that convictions set aside under the Act should not burden the youth offender later in life. In holding that the conviction should not have subsequent repercussions, either of a criminal or noncriminal nature, we quoted from *Doe v. Webster* (D.C. Cir. 1979), 606 F.2d 1226, in which the District of Columbia Circuit Court of Appeals stated:

> "It is clear that if [the] purposes of the Act are to be effectuated, the set-aside provision must be accorded a liberal construction which allows the rehabilitated youthful offender a meaningful fresh start by protecting him from those 'stigma' consequences of his conviction which impede his reintegration into society, as distinguished from an interpretation which grudgingly focuses only on the removal of 'legal' disabilities which are of more limited value to the youthful ex-offender seeking to reestablish a useful, productive, and law-abiding life." 606 F.2d at 1238.

In our case the defendant was placed under supervision pursuant to section 5—6—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—1(c)), which allows the trial court, upon a plea of guilty, to enter an order for supervision of the defendant if he has not been charged with a felony and after consideration of a number of factors. Upon conclusion of the supervision period, "if the court determines that the defendant has successfully complied with all of the conditions of supervision, the court shall discharge the defendant and enter a judgment dismissing the charges." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(e).) Further, it provides that:

> "Discharge and dismissal upon a successful conclusion of a disposition of supervision shall be deemed without adjudication of guilt and shall not be termed a conviction for purposes of disqualification or disabilities imposed by law upon conviction of a crime. Two years after the discharge

and dismissal under this Section a person may have his record of arrest expunged as may be provided by law." Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(f).

We find the statutes and facts in our case distinguishable from those in *Wunnenberg.* Our supervision statute was not enacted with the unique considerations of the Federal Youth Corrections Act in mind, which attempts to protect one from being penalized for acts done as a youth. Also, our statute is more narrowly drawn. Pursuant to section 5—6—3.1(f), the act appears directed at removing the "legal disabilities" associated with a conviction. (*People v. Talach* (1983), 114 Ill. App. 3d 813, 826-27.) Whatever the effect, it does not create an exception to the broad consideration of factors which we have interpreted to be properly considered by the sentencing judge or jury. Neither the language nor history of the statute precludes later use as aggravation evidence of criminal behavior relevant to a criminal charge. The supervision act merely provides that successful completion of the term shall be deemed without adjudication of guilt. As seen in our analysis, the admissibility is not limited to considering in aggravation crimes which resulted in adjudications of guilt. The guiding principle is whether the evidence is reliable and relevant. See *People v. Hightower* (1985), 138 Ill. App. 3d 5, 10; *contra People v. Calvert* (1981), 100 Ill. App. 3d 510, 511.

Given the broad language of the opinions of this court that the sentencing judge or jury should have all information relevant to the imposition of the penalty, we see no reason to hold inadmissible the proof of prior offenses for which the defendant received supervision. Such behavior demonstrates a continuing disposition toward criminal conduct.

The defendant raises a number of challenges to the constitutionality of our death penalty statute. In view of our decision to remand this matter for a sentence other

than death, it is unnecessary for us to consider these challenges.

The defendant's final contention is that he was improperly convicted of both armed violence and attempted murder because both charges arose from the act of shooting Arthur Hinshaw. The State argues that the convictions arose out of two separate physical acts, the two separate shots which the defendant fired at Hinshaw.

Under the doctrine of *People v. King* (1977), 66 Ill. 2d 551, 566:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. *Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts.* 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (Emphasis added.)

In *People v. Myers* (1981), 85 Ill. 2d 281, we also held that the defendant's actions supported convictions for armed violence and attempted murder. The defendant in *Myers* moved a knife twice from one victim's neck while threatening a second victim, thereby interrupting his initial attack on the first victim. This court found that although the two separate invasions of the first victim's body were closely related in time and in the same area of the neck, the acts were not one physical act.

We agree with the State that the facts in this case support the two separate convictions. According to Hinshaw's testimony, the defendant shot him once, then shot

Foss twice, searched through Foss' pockets, ordered Worley to the floor and then shot Hinshaw a second time. Thus, there were two separate physical acts sufficient to support each conviction, the two gunshots, along with a number of events intervening between the two acts. The cases cited by the defendant are distinguishable. In *People v. Donaldson* (1982), 91 Ill. 2d 164, three separate shots were fired at the victim, and the defendant was charged with three counts of aggravated battery and one count of armed violence. This court reversed the armed violence conviction on the ground that four convictions had been carved out of only three distinct physical acts. Here, in contrast, two convictions, one for attempted murder and one for armed violence, have been carved out of two distinct physical acts. In *People v. Mormon* (1982), 92 Ill. 2d 268, an armed violence conviction based on the use of a weapon to accomplish a rape was not based upon a distinct physical act; the use of the weapon was part of the "force" element of the crime of rape.

For the foregoing reasons the defendant's convictions are affirmed; however, the death penalty is set aside and the cause remanded to the circuit court of Cook County with directions to impose a sentence on the defendant other than death.

*Convictions affirmed; sentence vacated; cause remanded with directions.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.

JUSTICE CLARK, concurring:

Although I agree with the ultimate decision reached by my colleagues to vacate the death sentence and remand for imposition of a sentence other than death, I disagree with the majority's reasoning in reaching that conclusion

and therefore write separately. The defendant raised eight challenges to the imposition of the death sentence. Two of the defendant's arguments are of paramount concern here: (1) that the sentence was excessive given the significant mitigation presented during the hearing, and (2) that the sentence was partially based upon a prior charge which had been dismissed after a successful term of supervision.

I would vacate the defendant's sentence based on the erroneous introduction of the prior charge at the sentencing hearing and not because of what I find to be an unprecedented and wholly unwarranted extension of this court's prior decisions in *People v. Carlson* (1980), 79 Ill. 2d 564, and *People v. Buggs* (1986), 112 Ill. 2d 284. 128 Ill. 2d at 277-88.

I first address the defendant's claim of error concerning the admission of a misdemeanor unlawful use of weapons charge, which the majority concluded was admissible as relevant and reliable. (128 Ill. 2d at 282-83.) This charge had originally been dismissed after the defendant successfully completed a term of supervision. Under the pertinent section of the Criminal Code of 1961:

> "The Court may, upon a plea of guilty or a stipulation by the defendant of the facts supporting the charge or a finding of guilt, defer further proceedings and the imposition of a sentence, and enter an order for supervision of the defendant if the defendant is not charged with a felony and having regard for the circumstances of the offense, and the history, character and condition of the offender, the court is of the opinion that:
>
> (1) the offender is not likely to commit further crimes;
>
> (2) the defendant and the public would be best served if the defendant were not to receive a criminal record; and
>
> (3) in the best interests of justice an order of supervision is more appropriate than a sentence otherwise permitted under this Code." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—1(c).)

The Code goes on to provide that the court is to enter an order of supervision for a specified period, and shall "defer proceedings in the case until the conclusion of the period." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(a).) Likewise the court is to defer "entering any judgment on the charges" until supervision has been concluded. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(d).) At the conclusion of the period of supervision, if the court determines that the defendant has successfully complied with all of the conditions of supervision, "the court shall discharge the defendant and enter a judgment dismissing the charges." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(e).) Finally, the Code provides that:

"Discharge and dismissal upon a successful conclusion of a disposition of supervision shall be deemed without adjudication of guilt and shall not be termed a conviction for purposes of disqualification or disabilities imposed by law upon conviction of a crime. Two years after the discharge and dismissal under this Section a person may have his record of arrest expunged as may be provided by law." Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(f).

Our decision as to whether the supervision statute precludes the use in aggravation of a charge dismissed under its provisions must be strongly influenced, if not controlled, by our decision in *People v. Wunnenberg* (1981), 85 Ill. 2d 188.

In *Wunnenberg*, the defendant pled guilty to the charge of unlawful delivery of a controlled substance. At the sentencing hearing the court considered as aggravating evidence a Federal conviction which had been "set aside" under the Federal Youth Corrections Act (18 U.S.C. §5021(b) (1964)). In *Wunnenberg* our court held that this was error. Because of a widespread consensus that the Federal set-aside provision was intended to give " 'the rehabilitated youthful offender a meaningful fresh start' " (*Wunnenberg*, 85 Ill. 2d at 191-92, quoting *Doe v.*

*Webster* (D.C. Cir. 1979), 606 F.2d 1226, 1238), we concluded that the set-aside conviction "should not have subsequent repercussions, either of a criminal or noncriminal nature. Accordingly, defendant's set-aside conviction should not have been considered, however remotely, as an aggravating factor in sentencing for the instant offense." 85 Ill. 2d at 195.

The State and the majority opinion attempt to distinguish *Wunnenberg* on the ground that our statute, unlike the Federal set-aside provision, does not provide for "automatic" expungement of the defendant's record, but only allows the defendant to apply for expungement when two years have passed since discharge and dismissal. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(f).) This is wrong on two counts. First, it is by no means clear that the Federal set-aside provision "automatically" expunges the defendant's record. The provision itself states that the court's discharge of the offender "shall automatically *set aside* the conviction." (Emphasis added.) (18 U.S.C. §5021(b) (1964).) The Federal courts are divided as to whether the words "set aside" mean expungement, *i.e.*, physical obliteration, of the defendant's record. Compare *Mines v. National Transportation Safety Board* (6th Cir. 1988), 862 F.2d 617, 619, with *United States v. Gardner* (7th Cir. 1988), 860 F.2d 1391, 1399.

Second, and more importantly, the *Wunnenberg* court specifically disclaimed any reliance upon an interpretation of the Federal statute that would provide for "automatic" expungement. (*Wunnenberg*, 85 Ill. 2d at 191.) The crucial issue is not whether the record of the defendant's conviction is physically destroyed, but whether the conviction will have a subsequent penal consequence. Both statutes provide for discharge of the defendant and dismissal of the charges against him. Indeed, our statute goes further in providing that the disposition "shall be deemed without adjudication of guilt and shall not be termed a conviction

for purposes of disqualification or disabilities imposed by law upon conviction of a crime." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3.1(f).) The obvious intent of the statute is to reward a defendant who successfully completes a term of supervision by freeing him from future criminal consequences for the acts charged. In that limited sense, discharge under our statute is "akin to a judgment of acquittal." (*People v. Tarkowski* (1981), 100 Ill. App. 3d 153, 161.) No subsequent criminal consequence could be more serious than the use of the prior charge in aggravation at a capital hearing. It would surely be an anomaly if we held that the "legal disabilities" which the statute removes do not include a disability which may contribute to a defendant's receipt of the ultimate criminal sanction.

While the State and the majority attempt to distinguish between the prior charge and the facts underlying that charge, this distinction is without substance. If the supervision statute allowed the State to prove directly, by testimony, what it is now forbidden to prove indirectly, by court record, the statute would be meaningless. This court should not, by the mere use of rhetoric, so blithely obliterate the policy established by the legislature which permits a youthful offender to establish a clean slate.

Though not controlling, I note that this reasoning is consistent with the decision of the appellate court in *People v. Calvert* (1981), 100 Ill. App. 3d 510. (*Cf. People v. Chumbley* (1982), 106 Ill. App. 3d 72 (construing analogous provision in the Juvenile Court Act).) And while it may appear that some of the language in *People v. Talach* (1983), 114 Ill. App. 3d 813, may conflict with this reasoning, the facts of that case are distinguishable. *Talach* involved a defendant who had two valid convictions prior to being placed on five successive supervisions. Moreover, *Wunnenberg* itself does not purport to apply to "a continuing pattern of criminal behavior that resulted in a series of criminal convictions which were subsequently set

aside." (*Wunnenberg*, 85 Ill. 2d at 194.) Since we are dealing here with a single episode of supervision rather than a "pattern," this question need not be reached.

Nor do I agree with the State's contention that the admission of the charge was harmless because the evidence in aggravation was overwhelming. As should be clear from the discussion of the defendant's argument that his penalty was excessive (see 128 Ill. 2d at 277-78), the evidence in aggravation, while substantial, was somewhat less than overwhelming. Apart from the prior charge for which the defendant received supervision, he had no prior criminal record. Had the court granted the motion *in limine*, the defendant would clearly have been able to establish at least one statutory mitigating factor, lack of a significant history of prior criminal activity. I therefore cannot conclude that the erroneous admission of this evidence was harmless beyond a reasonable doubt.

While I would vacate the defendant's death sentence based solely on the erroneous admission of the prior charge, my disagreement with the majority does not end here. I must also address what I conclude to be the majority's erroneous analysis under this court's prior decisions in *Carlson* and *Buggs*. As the majority noted, the defendant argues that his case compares favorably to others where this court has found that death is not appropriate. (See *People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Crews* (1969), 42 Ill. 2d 60; *People v. Walcher* (1969), 42 Ill. 2d 159.) While the defendant cites all of these cases, he relies mainly upon *Carlson* and *Buggs*. 128 Ill. 2d at 278.

Also, as the majority noted, this court's analysis must be guided by the principle that the eighth amendment requires "consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the

process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) This court has previously concluded that, where the sum total of aggravating and mitigating circumstances "do not bespeak a man with a malignant heart who must be permanently eliminated from society" (*Carlson*, 79 Ill. 2d at 590), a sentence of death cannot stand. Neither the deterrent nor retributive functions of the death penalty are served where the commission of a murder seems to be an aberration brought on by special circumstances, circumstances which in all likelihood will not be repeated. This court found such special circumstances that were not likely to be repeated in *Carlson* and *Buggs*. However, for reasons which are clearly set out in my dissent in *Carlson* (see *People v. Carlson* (1980), 79 Ill. 2d 564, 593 (Clark, J., dissenting)), I cannot agree with the expanding erosion of this court's long held position that "we should not lightly overturn the findings of the trial court, particularly when they are amply supported by the record." (*People v. Brownell* (1980), 79 Ill. 2d 508, 540.) As I noted in *Carlson*, this court has often addressed the question of the weight to be afforded the decision of the trier of fact; we have held that, absent a clear abuse of discretion, this court will not disturb a sentence imposed by the trial court. See *People v. Lykins* (1979), 77 Ill. 2d 35, 40; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153; *People v. Bonner* (1967), 37 Ill. 2d 553, 563.

People v. Lykins (1979), 77 Ill. 2d 35, succinctly addressed this issue when this court stated that:

> "[t]hough Supreme Court Rule 615(b)(4) (58 Ill. 2d R. 615(b)(4)) allows the reduction of sentences by a reviewing court, 'It is not our function to serve as a sentencing court, and we will not substitute our judgment for that of the trial court merely because we might have imposed a different sentence had that function been delegated to us.' (*People v. Waud* (1977), 69 Ill. 2d 588, 596.) ***

*** The trial judge is authorized to consider not only the defendant's character but also the 'nature and circumstances of the offense' in imposing a sentence. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1(c)(1).)" *(People v. Lykins* (1979), 77 Ill. 2d 35, 40.)

Precisely because no two people will ever view or review the same set of facts from exactly the same perspective, "it is inappropriate to disregard the lower court's carefully considered and well-supported decision." *Carlson*, 79 Ill. 2d at 603 (Clark, J., dissenting).

While the majority discusses both *Carlson* and *Buggs*, in the interests of a coherent and complete argument here, I will reiterate the analysis.

In *Carlson*, the defendant, who was in his early forties, had no criminal record. For a year or two prior to the murders with which he was charged, the defendant had "deteriorated physically and emotionally." He had suffered two heart attacks, a cerebral concussion, and other injuries. Shortly before the murders, the defendant's wife of 19 years obtained a divorce from him. The defendant testified that he had agreed not to contest the divorce on the condition that his wife would not entertain men at the house. According to the defendant, after the divorce he and his wife continued to see each other and even had plans to remarry. The defendant's wife postponed the wedding, however, and later told the defendant that she would not be seeing him as frequently as before because she had a "boyfriend." Several days later, after having dinner with his wife, and having been told other details about her boyfriend, the defendant shot his wife 10 times with a gun he had purportedly bought for "protection." The defendant then poured gasoline throughout three rooms and set fire to the house. After killing his wife, the defendant gave several envelopes filled with cash to a friend to convey to his children, and sat down to drink in a bar. As a number of police officers approached

him in the bar, the defendant fired two shots, killing one of the officers. The defendant presented psychiatric testimony that at the time of the offense the defendant was undergoing a slow grieving process related to the loss of the affection of his wife and that he was extremely distraught when he killed the officer. (79 Ill. 2d at 570-73, 588-90.) The defendant had been sentenced to a term of years for the murder of his wife and had been sentenced to death for the murder of the police officer. It was the death sentence which this court vacated. 79 Ill. 2d at 591.

In *Buggs*, the defendant was a man in his forties with no prior criminal record. He had a severe drinking problem which had previously caused him to suffer blackouts. He had been drinking particularly heavily during the period just before he committed the offense. His wife had continually asked him for a divorce, which he refused to grant; he instead attempted to persuade her to work out their problems. She had begun entertaining various boyfriends at their home when the children were present. On the day in question, one of his wife's boyfriends persistently telephoned, leading to a final argument between the defendant and his wife. During that argument, the defendant's wife told the defendant that he was not the father of their two sons. It was at that point that the defendant became outraged, poured gasoline on his wife and the stairs and lit a match. In the ensuing blaze the defendant's wife and two of his children died. At trial, the defendant's expert witness testified that the defendant suffered from "Isolated Explosive Disorder," a single discrete episode in which the defendant's failure to resist an impulse led to an externally directed act that had a catastrophic impact on others. (112 Ill. 2d at 294-95.) The trial court sentenced Buggs to death and this court vacated that sentence. 112 Ill. 2d at 295-96.

The many factual similarities between *Carlson* and *Buggs* (including some, such as the accompanying arson,

which are purely coincidental) may obscure the underlying principles. The crucial facts about *Carlson* and *Buggs* are these: (1) the presence of two statutory mitigating factors: (a) no significant history of prior criminal activity (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(1)), and (b) action under extreme mental or emotional disturbance (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2)), and (2) unique and tragic circumstances impacting upon individuals who up until then had led relatively blameless lives, circumstances which were not likely to be repeated in the future. While in *Carlson* the death penalty was imposed for the murder of the police officer, the fact that the original or principal victims of the crimes were members of the defendants' families rather than strangers strongly suggested that the defendants' crimes were of the kind that were unlikely to be repeated in the future, or to be deterred by the threat of capital punishment.

Beyond this, however, *Carlson* and *Buggs* do not create a black letter law of capital sentencing. Each case is unique and must be evaluated upon its own facts. At both the trial and the appellate level, the inquiry must focus on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction are served.

The defendant argues that, based on this court's analysis in *Carlson* and *Buggs*, his death sentence should be vacated and notes these mitigating circumstances: his youth, family background, employment history, lack of prior convictions, emotional problems, and drug and alcohol dependency. This evidence of mitigation, while not inconsiderable, is also not quite so strong as the defendant makes out. Evidence of the defendant's drug habit, for example, comes only from the defendant's un-cross-examined and, apparently, uncontroverted statements in the sentencing report. In *Carlson* and *Buggs*, in contrast, evidence of drug and alcohol dependency was far more substantial.

The more important distinction between this case and the others, however, lies in the very circumstances of the crime itself. In *Carlson* and *Buggs*, uncontroverted evidence established that the murders committed were the product of prior tragic circumstances and a precipitating provocative event. In this case, while the majority in one breath declines "to equate the loss of a job with marital difficulties" (128 Ill. 2d at 281), they finish that same breath with the conclusion that in losing his job, the stress suffered by the defendant in his own mind "may have been equal to that suffered by the defendants in *Buggs* and *Carlson*" (128 Ill. 2d at 281).

Statistics may seem to disparage the institution of marriage by verifying that more and more marriages end in divorce, yet it is inconceivable that in today's mobile. and changing society a person's reactions to the loss of a spouse may be in any way equated to the loss of a job. While certainly not a legal tool nor a response determiner, even the somewhat popular Holmes-Rahe Stress Scale, a scale which ranks life's "stressful" events on a particular point system ranging from 11 to 100, ranks the death of a spouse over two times more stressful than being fired from a job while divorce is one-third more stressful than being fired (death of a spouse ranked at 100 points, divorce at 73 points, and being fired at 47 points). I am not suggesting by mentioning this psychological tool that this court should in any way rely on such mechanisms in reaching a decision; however, such information is not beyond notice. I recognize that each individual's reactions to stress are unique and may be determined only by the amount of control the individual may feel he has over a particular situation.

In this case it seems clear that there is considerable evidence of rational calculation and planning in the defendant's actions rather than an uncontrolled response to an overwhelming stress. Additionally, even assuming

that the defendant acted in part out of a desire to revenge himself upon Arthur Hinshaw, a "father figure," there is considerable evidence that robbery was a secondary, and by no means unimportant, motive. According to the testimony of both the surviving victims, the defendant opened fire almost immediately upon Hinshaw and Frederick Foss. The defendant's story that Hinshaw taunted him is not supported by the testimony of either Hinshaw or Worley. According to Hinshaw's testimony, the defendant fired the second shots at Hinshaw and Worley while they were lying on the ground. It is undisputed that he rifled their pockets. The fact that the defendant kept Worley alive only long enough to assist him in attempting to open the safe, and then shot him, obviously intending to kill, is further evidence of rational planning. According to both Hinshaw's testimony and the defendant's own confession, the defendant stated during the course of the incident that he shot Worley because of fear that Worley would "tell on him"—an obvious attempt to eliminate any witness to the crime. The defendant also attempted to conceal the murder weapon. And while the defendant argues that no rational criminal would attempt to rob a store where he had recently worked, this argument is undercut by the defendant's obvious efforts to make sure that no one who could identify him would survive.

This evidence of rational calculation, of a not inconsiderable degree of planning and preparation, constitutes nonstatutory aggravation which is not outweighed by the somewhat questionable mitigating evidence introduced by the defendant. It also belies the defendant's claim that he, like the defendants in prior cases, established as a mitigating factor that he acted under extreme mental or emotional disturbance.

For these reasons, I cannot agree with my colleagues' extension of the *Carlson* rationale in this case. Moreover, I find such an extension not only unwarranted but illogi-

cal when I note that the majority discusses a "blameless life except for this *one* explosive episode" (emphasis added) (128 Ill. 2d at 282), while, at the same time, allowing in evidence of a prior charge which would seem to contradict that finding. However, because I agree with the decision in that I would, as stated earlier, vacate the defendant's death sentence for different reasons, I concur.