THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KENNARD COMBS, Defendant-Appellant.

First District (1st Division)   No. 1—87—0893

Opinion filed September 17, 1990.—Rehearing denied December 26, 1990.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a joint bench trial with codefendant, .Christopher Kellum,[1] defendant, Kennard Combs, was found guilty of 12 counts of aggravated criminal sexual assault, one count of home invasion, one count of armed robbery, one count of attempted armed robbery and three counts of aggravated unlawful restraint. (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14, 12—11, 18—2, 8—4, 10—3.1, respectively.) He was sentenced to concurrent prison terms of 55 years, 12 years and 12 years for aggravated criminal sexual assault, armed robbery and home invasion and to a consecutive prison term of six years for attempted armed robbery. No sentence was entered on the three counts of aggravated unlawful restraint. On appeal, defendant contends that: (1) defense counsel's admission of defendant's guilt during closing argument constituted ineffective assistance of counsel; (2) the trial court erroneously found defendant guilty of the three counts charging him with aggravated criminal sexual assault predicated on the act of inserting his penis in the victim's vagina; (3) the convictions of six of the remaining nine counts of aggravated criminal sexual assault should be vacated on the ground that the nine counts were predicated on only three acts; and (4) the cause should be remanded for resentencing. For the following reasons, the judgment is affirmed in part and vacated in part; and the sentences are affirmed.

The record sets forth the following facts relevant to this appeal. At trial, the victim, D.C., testified that on May 27, 1986, she and her six-year-old daughter were in their third-floor apartment when D.C. heard someone outside the building call her name. When she looked out of her front window, Curtis, a man who worked across the street, asked her to come down and to move her car so that he could drive his truck through. D.C. told her daughter to wait in the apartment while she ran outside to move the car. She left the door to her apartment open so that her daughter would not be afraid.

When D.C. got to the first-floor landing, defendant was standing there, pointing a gun at her face. She then looked toward the ground floor and saw James Lurry, who also lived in the building, lying face-

---

[1]Codefendant Kellum is not a party to this appeal.

down on the floor while Christopher Kellum stood over him, holding a knife. Defendant told D.C. not to say anything or he would blow her head off. He then pushed her, face first, against the wall. She was standing there with the side of her face pressed against the wall when Kellum came over to her, lifted up her dress, tore off her underwear, and forced her to lie facedown on the first-floor landing. While in that position, D.C. felt a knife on the right side of her neck as Kellum got on top of her and inserted his penis into her vagina.

When Kellum got up, he asked her where she lived. D.C. hesitated at first, but when defendant walked over to her, grabbed her by the back of her hair and repeated the question, she told them that she lived on the third floor with her child. With the gun still pointed at her, defendant told Kellum they were going to D.C.'s apartment. Lurry got up and the four of them went up the stairs.

When they reached D.C.'s apartment door, defendant pushed D.C. into the apartment and told her to sit on the couch with her daughter and Lurry. Kellum then shut the apartment door and locked it. Defendant continued to point the gun at her. One of the men then ordered D.C., her daughter and Lurry to put either sheets or towels over their heads. After they did so, D.C. and her daughter pulled their covers down a little and watched defendant and Kellum as they ransacked the apartment and saw Kellum unhook her VCR and put video tapes into her red Nike gym bag. Defendant then asked D.C. for some money. When she said that she did not have any, he threatened that if they found any, he would blow their heads off. D.C. then told defendant that she had $5 in her purse and $15 in her coat pocket.

While still pointing the gun at D.C., defendant told her to go into the bathroom with him. Once in the bathroom, he told her to bend over the tub and he pulled the back of her dress up and rubbed all over her. He then told her to get up and to sit back down on the couch. When she sat on the couch, defendant sat on the table in front of her and put her legs on top of his, raised her dress, pulled out her tampon, began rubbing the gun barrel against her vagina, and then inserted the barrel into her vagina. After he took the barrel out, defendant whispered something to Kellum and told D.C. to go into the kitchen.

Defendant remained in the living room, and Kellum, armed with a knife, went into the kitchen with D.C. Kellum then pushed D.C. against the wall and attempted to insert his penis into her vagina. When he was unsuccessful, Kellum sat down on a chair and told D.C. to sit on his lap. When he was still unsuccessful at penetrating D.C.,

Kellum told her to bend over the table. When she did so, he inserted his penis into her vagina and started moving. At that point, defendant came into the kitchen and said to Kellum, "Let's go." The two men then left.

When D.C. heard the front door shut, she ran into the living room, noticed that Lurry had also left, and locked the door. She then felt dizzy and fell to the floor. The next thing she remembered was her two brothers and mother knocking on her apartment door. The police arrived a short time later and D.C. was taken to the hospital for an examination. D.C. testified that her VCR, video tapes, Walkman radio and leather work-out gloves had been taken.

On June 2, 1986, while with her two brothers, Robert and Demetri, and a friend, D.C. stopped at her mother's house where her daughter had been playing in the front yard. Her daughter told her that she had seen one of the assailants across the street. D.C. told her brothers and her friend and they all got into the friend's car and drove around looking for the assailant. At 72nd and Halsted, D.C. saw Kellum. She told her friend to drive around and try to find a police car. When they could not find a police car in the neighborhood, they drove to the police station. However, by the time they returned to 72nd and Halsted with the police, Kellum was no longer in sight. D.C., her brothers, and her friend continued to drive around, looking for Kellum. Eventually, they spotted both Kellum and defendant and alerted the police. The following day, D.C. viewed a lineup at police headquarters and identified defendant and Kellum as the assailants. The testimony of D.C.'s daughter corroborated D.C.'s version of the events that had occurred in the apartment living room. The daughter identified both defendant and Kellum as the assailants.

Charles Bailey, D.C.'s first-floor neighbor, then testified that on May 27, 1986, as he was approaching the apartment building, he happened to look up and saw a male looking out the window of D.C.'s third-floor apartment. When he entered the building, he heard people running down the stairs. Once inside his apartment, he looked out the window and saw two men walking out of the building, carrying bags. One was carrying a red Nike gym bag and the other was carrying a gray plastic bag.

Bailey then went outside to watch the men. By the time he got outside, Kellum and defendant were almost to the alley. When they turned around and saw Bailey, they started to run toward the alley and then turned and ran down the alley. Bailey continued to follow them, and at the alley entrance, he saw D.C.'s brother, Demetri. He told Demetri that the two men had just come out of his sister's apart-

ment building. Both Bailey and Demetri then ran down the alley after Kellum and defendant. Defendant turned around once and shot at them. At the end of the alley, Bailey found the red Nike bag. He picked it up and gave it to a cousin of his, telling her to take it to D.C. He then saw a male walking out of the alley, carrying a VCR. When Bailey confronted the male and asked him where he got the VCR, the male told him that he had found it in the alley. Assuming that it belonged to D.C., Bailey took the VCR to her apartment. On June 3, 1986, Bailey identified defendant and Kellum in a lineup at police headquarters, and later identified them at trial.

Next, Demetri, D.C.'s brother, testified that on May 27, 1986, approximately 8:30 p.m., he was standing at the corner of 74th and Union, talking to some friends, when he saw two men running toward him from D.C.'s apartment building. One was carrying a red Nike gym bag and the other was carrying a gray plastic bag. Recognizing the red gym bag as belonging to his sister, Demetri ran to the alley where he met Bailey and then the two of them ran after defendant and Kellum. While Demetri and Bailey were chasing defendant and Kellum down the alley, defendant turned around and shot at them. By the time Demetri reached the end of the alley, he had lost sight of the assailants. He then went to his sister's apartment, where he found her lying on the floor, crying hysterically, saying that she had been robbed and raped. The apartment had been ransacked. At trial, Demetri identified defendant and Kellum as the two men he had chased.

Demetri further testified as to the events of June 2, 1986, when he, D.C., his brother, Robert, and his friend, Tim, were riding in Tim's car, looking for the assailants. Demetri's testimony as to the events of that day corroborated D.C.'s testimony. In addition, the testimony of D.C.'s brother, Robert, also corroborated the others' testimony as to the events of June 2, 1986.

Detective Michael Kill of the Chicago police department then read defendant's statement into the record. In his statement, defendant stated that the "stickup" had been Kellum's idea; that Kellum had raped D.C.; that they both had taken money from D.C.; that Kellum had taken the VCR and tapes; that he had rubbed D.C.'s vagina with the barrel of his gun; and that he had shot once at the two males who had chased them down the alley.

When the State rested its case, defense counsel moved for a directed verdict, which the trial court denied. Defense counsel then rested its case. Following closing arguments, the trial court entered its verdict. Defense counsel's post-trial motion for a new trial was subsequently denied and a sentencing hearing was held, after which

defendant was sentenced to concurrent prison terms of 55 years, 12 years and 12 years for aggravated criminal sexual assault, armed robbery, and home invasion, respectively, plus a consecutive six-year prison term for attempted armed robbery. Defendant's timely appeal followed.

Initially, defendant contends that defense counsel's admission of defendant's guilt during closing argument constituted ineffective assistance of counsel during a critical stage in the proceedings and rendered the trial nonadversarial, thereby necessitating reversal without any requirement that prejudice be shown. Specifically, defendant refers to the following comments made by defense counsel during closing argument:

"I have been struggling since this case's inception to come up with a defense, and I have concluded that I have not come up with a salient defense because the crime was committed so poorly. Evidence was so overwhelming, the testimony of [D.C.], things that happened are almost irrefutable, Judge.

\* \* \*

Judge, in the case such as this, your Honor, it is quite difficult for me to distinguish in my presentation between an argument which is a true closing argument and an argument in mitigation. I will attempt to do so, but if I transgress and get into mitigation, I will definitely try to limit myself. I have the feeling I think that this situation is analogous to my jumping from a garage as a descent to the bottom of that void there.

As the Court knows, it is a horrible case.

\* \* \*

We have evidence that at some point at the conclusion of this, Kennard Combs and Christopher Kellum had sexual intercourse in the kitchen before they left. Kennard Combs did not touch her at the beginning of this. He did not touch her at the end. The only instance of aggravated sexual assault would be the touching as to Kennard Combs.

I know that under the accountability theory, Mr. Kennard Combs would be responsible for everything that Christopher Kellum did at this incident."

In response, the State argues that defense counsel's closing statements were an attempt to mitigate defendant's participation in the incident and that the record indicates that defense counsel had conducted an able and vigorous defense despite the overwhelming evidence against his client.

■■ As a general rule, a defendant alleging ineffective assistance

of counsel must satisfy the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (the *Strickland* test), which requires that defendant prove: (1) his counsel made such serious errors and performed so deficiently that he was not functioning as "counsel" guaranteed by the sixth amendment of the United States Constitution; and (2) his counsel's deficiencies prejudiced him so as to deprive him of a fair trial. However, if defendant can establish *per se* ineffective assistance of counsel by showing that defense "counsel entirely fail[ed] to subject the prosecution's case to a meaningful adversarial testing," prejudice will be presumed and he need not satisfy the *Strickland* test. *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118.

■ In Illinois, proof of *per se* ineffective assistance of counsel has evolved from simply a concession by defense counsel of defendant's guilt (*People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513) to a requirement that defense counsel must have "entirely failed to subject the prosecution's case to meaningful adversarial testing." (*People v. Johnson* (1989), 128 Ill. 2d 253, 270, 538 N.E.2d 1118.) In *Hattery*, defendant was charged with murder and pleaded not guilty. In an attempt to avoid the death penalty, defense counsel admitted defendant's guilt in his opening statement to the jury and attempted to establish on cross-examination that defendant had been compelled to kill his victims. Defendant was convicted of murder and sentenced to death. On direct appeal to the supreme court, the court found that the admission of defendant's guilt by his counsel was unequivocal and "totally at odds with defendant's earlier plea of not guilty." (*Hattery*, 109 Ill. 2d at 464.) As a result, defense counsels' conduct had not subjected the prosecution to the meaningful adversarial testing required by the sixth amendment.

Subsequently, in *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118, the supreme court narrowed the *Hattery* holding and held that a concession of guilt by defense counsel does not constitute *per se* ineffectiveness of counsel. Rather, defendant must first prove that his counsel "entirely failed to subject the prosecution's case to meaningful adversarial testing." (128 Ill. 2d at 270.) In *Johnson*, defendant was indicted for one count of intentional murder, two counts of knowing murder, three counts of felony murder, two counts of attempted murder, seven counts of armed violence, four counts of aggravated battery, three counts of armed robbery, one count of theft, and one count of unlawful restraint, stemming from an incident in which one man was killed, two others were wounded and personal property was taken. During his opening statement, defense counsel

stated that the issue was not whether defendant had committed a murder, but whether he had committed the murder during the course of a felony. This defense strategy was based on defense counsel's belief that defendant would not be eligible for the death penalty if the murder had not occurred during the course of a felony. Defense counsel's statement as to what the evidence would show was consistent with defendant's confession and his testimony at the sentencing hearing.

On behalf of the State, two of the victims, co-workers of defendant, testified as to the events leading up to the shootings. In addition, the State introduced into evidence defendant's written statement, in which he admitted shooting the victims and taking their wallets. Although defense counsel presented no evidence, he did cross-examine each of the State's witnesses in an attempt to prove that defendant had not entered the work premises with the intent to rob any of the victims. Subsequently, during closing argument, defense counsel stated, "Your Honor, we did admit in our opening statement that Brian Johnson committed murder," but that the State had failed to prove felony murder. Defendant was found guilty of all charges and sentenced to death. On direct appeal to the supreme court, defendant argued, *inter alia*, that he had been deprived of effective assistance of counsel.

In holding that defendant had not been denied effective assistance of counsel, the supreme court stated:

> "In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists. Though concession of the murder was made, going to trial did preserve for the defendant matters that a guilty plea necessarily would have waived. Counsel did not concede each element of attempted murder, felony murder, armed violence, aggravated battery, armed robbery, theft and unlawful restraint." (128 Ill. 2d at 270.)

The *Johnson* court concluded that defense counsel had not been *per se* ineffective because he had asserted a theory of defense and had not "entirely failed" to subject the prosecution's case to meaningful adversarial testing. Therefore, because the presumption of prejudice did not arise, defendant had to establish prejudice pursuant to the *Strickland* test in order to prove ineffective assistance of counsel. In applying the *Strickland* test, the court further stated that, "[c]laims of ineffective assistance of counsel may be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without

deciding the first prong, whether the errors were serious enough to constitute less than reasonably effective assistance." 128 Ill. 2d at 271.

Shortly after *People v. Johnson* was decided, the supreme court decided *People v. Chandler* (1989), 129 Ill. 2d 233, 543 N.E.2d 1290, in which it held that *per se* ineffective assistance of counsel had not occurred and applied the *Strickland* test to determine whether defendant had been prejudiced by defense counsel's actions. Unlike in *Johnson*, the *Chandler* court concluded that defendant had been prejudiced and, thus, had been denied effective assistance of counsel. The *Chandler* court reached its decision based on the following facts:

> "Defendant was charged with four counts of murder, including felony murder ***. Counsel's apparent strategy was to convince the jury, in closing argument, to believe defendant's denial, in his statements to the police, of killing the victim. This strategy was the basis of counsel's deficiency. Counsel did not attempt to develop a theory of innocence during his cross-examination of several witnesses, and did not cross-examine several key witnesses at all. Moreover, counsel presented no witnesses on behalf of the defense and failed to call defendant to the stand even though he had stated in his opening argument that defendant would testify and tell the jury what he did and did not do. Defense counsel apparently mistakenly believed that the jury could find defendant not guilty of murder if they believed that he had not inflicted the fatal wounds to the victim. Indeed, defense counsel concluded his closing argument by telling the jury, 'I don't think if you take a realistic view of this that you can find [defendant] guilty of murder.' The jury, however, having been instructed on both felony murder and accountability, had no choice but to find defendant guilty of murder, residential burglary and arson.
>
> The jury could have returned a not-guilty verdict on the charged offenses only if it had chosen to disregard the jury instructions. Counsel had admitted that defendant was telling the truth in his statements to the police, and that he had broken into the victim's house. The ultimate error of counsel's strategy, however, is revealed by the fact that even if counsel had succeeded in persuading the jury that defendant did not stab the victim, the jury was still instructed to find defendant guilty of murder under the law of accountability or felony murder." 129 Ill. 2d at 246-47.

In summation, based upon *Johnson* and *Chandler*, a defendant

can establish *per se* ineffectiveness of counsel only if the facts establish that defense counsel had failed entirely to subject the prosecution's case to meaningful adversarial testing. If defendant fails to do this, he must satisfy the *Strickland* test by proving that defense counsel's deficiencies prejudiced him so as to deprive him of a fair trial.

■ In the present case, during closing argument, defense counsel admitted that there had been home invasion, kidnapping, and unlawful use of a weapon. However, he argued that defendant could not be found guilty of aggravated criminal sexual assault or attempted murder. All of the offenses admitted to during closing argument had also been admitted to by defendant in his statement which had been read into evidence. Therefore, those concessions by defense counsel do not by themselves establish *per se* ineffectiveness of counsel. (*People v. Chandler* (1989), 129 Ill. 2d 233, 543 N.E.2d 1290.) Further, the fact that defense counsel argued against the charges of aggravated criminal assault and attempted murder also removes the facts from the *per se* rule on the ground that defense counsel had not failed entirely to present a meaningful adversarial defense. *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118.

■ Having determined that defense counsel had not been *per se* ineffective, it is necessary to review the record to determine whether the claimed errors prejudiced defendant. A review of the evidence indicates that D.C., her daughter, her two brothers and Charles Bailey identified defendant as one of the perpetrators. Descriptions of the bags carried by the perpetrators from D.C.'s apartment were corroborated by D.C., her brother and Charles Bailey. The items taken from D.C.'s apartment were found in the alley through which defendant and Kellum had escaped. Both Charles Bailey and Demetri testified that defendant had shot at them as they ran through the alley. In a signed statement, defendant admitted that he had pointed a gun at D.C. on the first-floor landing of her apartment building; that he had touched D.C.'s vagina with the barrel of his gun; that he had taken money from D.C.; and that he had fired his gun at two males who were chasing him through the alley. The evidence in this case is so overwhelming as to defendant's guilt that there is no reasonable probability that defendant would not have been found guilty in the absence of defense counsel's statements. Therefore, we find that defendant has failed to establish that he had been prejudiced by defense counsel's statements.

Moreover, we find that defendant's reliance on *People v. Williams* (1989), 192 Ill. App. 3d 304, 548 N.E.2d 738, is misplaced. In *Williams*, this court held that defense counsel's representation of defend-

ant was *per se* ineffective. Unlike defense counsel in the present case, defense counsel in *Williams* waived opening and closing statements, did not cross-examine any of the State's witnesses and failed to obtain a ruling on pre-trial motions. As a result, the *Williams* court concluded that defense counsel had failed to subject the prosecution's case to meaningful adversarial testing. By contrast, in the present case, defense counsel vigorously cross-examined the State's witnesses and took the position during his closing statement that the State had failed to prove defendant guilty of attempted murder and aggravated criminal assault.

■ Next, defendant contends that the trial court erroneously found him guilty of counts 19, 21, and 23, charging aggravated criminal sexual assault predicated on defendant's act of inserting his penis into D.C.'s vagina, and that the convictions of six of the remaining nine counts of aggravated criminal sexual assault should also be vacated on the ground that the nine counts were based on only three acts. The State concedes that there was no evidence presented to support the charges brought pursuant to counts 19, 21, 23 and, therefore, agrees that the convictions for these counts should be vacated. The State also concedes that six of the remaining nine counts of aggravated criminal sexual assault should be vacated pursuant to the "one act, one crime" rule set forth in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. Accordingly, by agreement of the parties, counts 19, 21 and 23 are vacated for lack of evidence and six of the remaining nine counts of aggravated criminal sexual assault are vacated on the ground that the nine counts were based on only three acts.

■ Finally, defendant contends that because 9 of the 12 counts of aggravated criminal sexual assault are to be vacated, the cause must be remanded for resentencing on the remaining counts. In response, the State argues that in imposing the sentences, the trial court focused on the heinous and brutal nature of defendant's actions and not the number of counts. Therefore, the sentences should be affirmed.

In reaching a determination as to whether a cause should be remanded for resentencing when less than all of the counts of an offense have been reversed, the reviewing court must consider whether the trial court may have been influenced by the number of counts when it imposed sentencing. (See *People v. Alcazar* (1988), 173 Ill. App. 3d 344, 527 N.E.2d 325.) In the present case, in imposing the sentences upon defendant, the trial court stated:

> "Having considered all the facts and the circumstances in this case, the presentence investigation report, the facts of the case which I have reread, the conduct, you, Mr. Combs, the conduct

that was cruel, brutal and sadistic. You acted as an animal, a dangerous animal.

And in my judgment that you should not be free to society.

\* \* \*

Further find that you are eligible for an extended term. That your conduct constituted exceptional brutal and heinous behavior, indicative of wanton cruelty."

In light of the facts and circumstances of this case, as well as the foregoing statement by the trial court, we are not persuaded that the exclusion of the nine counts vacated on appeal would have altered the trial court's sentencing.

Based upon the aforementioned, the judgment of the trial court is vacated as to nine counts of aggravated criminal sexual assault; affirmed as to the remaining counts of aggravated criminal sexual assault, home invasion, attempted armed robbery, armed robbery and aggravated unlawful restraint; and the sentences imposed are affirmed.

Affirmed in part; vacated in part.

BUCKLEY, P.J., and O'CONNOR, J., concur.