THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON ZARATE, Defendant-Appellant.

First District (2nd Division)   No. 1—93—0997

Opinion filed May 31, 1994.

Rita A. Fry, Public Defender, of Chicago (Denise R. Avant, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William John Healy, and James Navarre, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Ramon Zarate was charged by information with two counts of home invasion (Ill. Rev. Stat. 1989, ch. 38, pars. 12—11(a)(1), (a)(2) (now 720 ILCS 5/12—11(a)(1), (a)(2) (West 1992))), one count of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))), one count of residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3 (now 720 ILCS 5/19—3 (West 1992))), and one count of aggravated unlawful restraint (Ill. Rev. Stat. 1989, ch. 38, par. 10—3.1(a) (now 720 ILCS 5/10—3.1(a) (West 1992)))

in connection with an attack on Christin Ernst. He appeals from his home invasion and armed violence convictions.

At defendant's bench trial, Ernst testified that on February 5, 1992, at about 6:35 a.m., she was assaulted by an intruder while she showered in her twenty-first-floor apartment in the Parkshore Apartments at 195 North Harbor Drive in the City of Chicago. Ernst was standing with her back to the shower head, washing her hair with her eyes closed, when she felt someone grab her right arm. The tub's clear plastic shower curtain was partially open, and, when she opened her eyes, she was able to see a man standing outside the tub with a white plastic bag over his head holding a knife in his right hand. The man held what Ernst described as a diver's knife with a blade approximately six inches in length. Ernst sought to grab the man's right hand and struggled with him until she slipped and fell, hitting the tub nozzle in such a way as to cause the water to flow from that source rather than from the shower head. The man then reached over her and stabbed her in the leg; they continued struggling for another minute or two until he got up and ran out of the bathroom, leaving the plastic bag.

Ernst testified that during their approximately five-minute encounter, the man's face was about 10 to 12 inches from hers and she could see the side of his head, his straight black hair, his eyes, and the upper part of his nose through the large eye-holes in the bag. He was wearing a Parkshore maintenance uniform, consisting of dark blue pants and a white short-sleeved shirt with patches on either side of the chest. He was somewhat overweight and his shirt fit snugly. Ernst recognized her assailant as defendant, a Parkshore maintenance man, whom she had seen approximately 30 times before in the building.

After her attacker left, Ernst closed the bathroom door and began screaming. She then turned off the water so she could listen for his movements in case he was still in her apartment. When she believed that he was gone, she wrapped a towel around herself and went out into the hall, banging on apartment doors until her neighbor in apartment 2101, Mark Glennon, opened his door and took her in. He called the police and periodically opened his door to check for their arrival. At one point when Glennon opened his door, Ernst looked out and saw defendant with a security guard in the hallway; she immediately screamed at defendant, "That's him! That's him! Keep him away from me!"

Within a few minutes, the police arrived, and Ernst was taken to Northwestern Hospital. She required eight stitches in her knee where she had been stabbed. She also suffered bruises and a bump on the back of her head as a result of the attack.

On cross-examination, Ernst stated that during the six months she resided in the building, maintenance men periodically had entered her apartment in her absence to make repairs; she insisted, however, that she saw and recognized her attacker. She further stated that defendant was pulled down when she fell, but that he was not pulled into the tub, which had "very little" water in it because it had been draining out as she showered. She conceded that there were two or three maintenance men who, like defendant, were Hispanic. On redirect examination, she contended that none of the other Hispanic maintenance men resembled defendant.

Glennon testified that when Ernst entered his apartment, she told him that she recognized her attacker, stating that "it was one of the maintenance guys." He also corroborated Ernst's testimony regarding her identification of defendant as he walked down the hall with the security guard.

Alejandro Negron, a Parkshore doorman and security guard, testified that at about 6:30 a.m. on February 5, 1992, he received a call from a tenant who had heard screaming which she believed came from the twenty-fourth floor. He radioed defendant, who was on-duty at the time, and told him to investigate. About one minute later, he received a call from another tenant who had heard screaming that she thought came from the twenty-second floor. Negron again radioed defendant and told him to check the twenty-second floor. A few minutes later, defendant came to the lobby and reported that he had found nothing. Negron and defendant then went together to the twenty-fourth floor and checked that floor and each of three lower floors, descending on the staircase. When they reached the twenty-first floor, Glennon called to them that the victim was in his apartment. Ernst looked out and identified defendant as her attacker.

Negron testified that monitors were positioned at his desk in the lobby of the building and that he had not noticed anyone unusual entering or exiting the building that morning. He also stated that defendant did not resemble the other two Hispanic maintenance men who worked at Parkshore.

On cross-examination, Negron recalled that when defendant came down to the lobby, he looked neat and had a calm demeanor. Defendant asked Negron to call his boss, Joe Cacic, after Ernst accused him of attacking her.

Officer Frank Bresnahan testified that he and his partner were called to the Parkshore at about 7 a.m. on February 5, 1992. He met with defendant and noticed that he had some small bloodstains on his shirt. At Bresnahan's request, defendant changed shirts and gave

Bresnahan his uniform shirt. Bresnahan noticed that defendant's uniform shirt was tight on him. On cross-examination, Bresnahan recalled that defendant did not look wet and that a search of the area failed to uncover a weapon.

Detective William Mosher, who was assigned to investigate the assault on Ernst, testified that he and his partner interviewed defendant at about 11 a.m. after informing him of his *Miranda* rights. Mosher noticed scratches on defendant's left cheek and when he inquired of defendant how he got them, he stated that he could not remember. Mosher also noticed an approximately two-inch cut extending from the top of defendant's thumb down the back of the finger. The cut did not appear to be from a hangnail or nail biting.

Defendant related to Mosher that he arrived at work at about 6 a.m. that morning and that he was assigned to clean model apartments on the twenty-fifth floor. While there, he received the radio message from Negron regarding a woman screaming somewhere between the twenty-second and twenty-fourth floors. Defendant stated that he checked those three floors and, after finding nothing, went to the lobby. He and Negron then went to the twenty-first floor and, according to defendant, they knocked on the door of apartment 2101. Just as the tenant answered, another door on the floor opened and a woman began screaming, "That's him!" Mosher testified that defendant had three keys which he claimed were keys to his home. However, after Mosher discovered that one of the keys opened Ernst's door, defendant conceded that one of the keys was a Parkshore master key.

On cross-examination, Mosher stated that defendant told him that he had gotten blood on his shirt when he bit his nails. Mosher recalled unsuccessfully searching for a weapon in Ernst's apartment and other areas of the building.

The parties stipulated that if called to testify, Tracy Braun, the apartment manager, would have testified that on the morning of the attack on Ernst, defendant, Negron, and Remagio Rico, a garage attendant, were on-duty and that Rico was 60 years old and under five feet tall. Defendant was 37 at the time of trial and is five feet six inches tall. The parties also stipulated that Parkshore maintenance men wore a uniform of dark blue pants and white short-sleeved shirts with a name tag on the left and a Parkshore patch on the right.

After the State rested, defendant moved for a "directed verdict" (whatever that means in a bench trial), which the trial judge denied. Defendant then informed the court of additional stipulations by the parties. They stipulated that if called to the stand, Cecilia Doyle, an expert in serology and blood analysis with the Chicago police

department crime laboratory, would testify that the blood on defendant's shirt was not consistent with Ernst's but was consistent with defendant's. They also stipulated that if Theodoris Patterson, an expert in fingerprint analysis with the Chicago police department crime laboratory, were called to testify, she would state that the fingerprints found on the plastic bag did not match either defendant's or Ernst's fingerprints.

Joe Cacic, chief engineer for Parkshore Apartments, testified that he came down to the lobby just after 6:30 a.m. on the morning of the attack in response to Negron's call, and when he saw defendant, he did not appear to have been in a struggle and he was not wet. He described defendant as frightened, "almost in tears," and noticed that he was biting his fingernails. He stated that he had observed defendant biting his nails occasionally in the past. He instructed defendant to wait in the lower level janitor's locker room.

Cacic testified that the janitorial staff consisted of nine employees, including himself, and that each maintenance man had 11 uniforms which were hung on pipes in the locker room. Cacic described a vestibule and exit about 15 feet away from the janitor's locker room. He stated that the exit doors were occasionally unlocked and that they were often propped open by tenants walking their dogs just outside the building in the alley or beyond, in a large prairie. He noted that he had seen homeless people outside the building living under lower Wacker Drive and Lake Shore Drive.

Cacic recalled that about five maintenance men had master keys at the time of the attack on Ernst. He also remembered that defendant was the only maintenance man on duty in the early morning of February 5, 1992.

On cross-examination, Cacic stated that two other Hispanic maintenance men were scheduled to work that day, but that neither resembled defendant. He also stated that defendant was the only Hispanic maintenance man with his own master key. Cacic testified that he did not instruct defendant to clean the model apartments on the twenty-fifth floor on February 5, but that that task was part of his assigned duties.

Dennis Leppin, who resided in a twenty-first-floor Parkshore apartment at the time of the crime, testified that he noticed a maintenance man holding a plastic bag in the hallway while he waited for an elevator at about 6:30 a.m. on February 5, 1992. On that morning, although defendant was in a lineup which he viewed, Leppin was unable to identify anyone.

Defendant testified that on February 5, 1992, he arrived at work at about 5:30 a.m. and changed into his uniform. He then went to the

lobby and chatted with Negron for about 20 minutes. During their conversation, defendant asked for a cigarette, and Negron left his post to obtain one from the doorman in the building across the street. When defendant noticed that it was nearing 6 a.m., he left the lobby to begin work in the leasing office on the twenty-fifth floor. After he loaded the dishwasher, he got the call from Negron regarding the reports of a woman screaming. According to defendant, Negron told him to come downstairs and they then searched from the twenty-fourth floor to the twenty-first floor, where a woman came out of an apartment screaming at defendant, "That's him!" Defendant then asked Negron to call his boss. Defendant further testified that he got blood on his shirt when he was biting his nails, and that his key ring contained both his personal keys and his work keys. He denied assaulting Ernst.

After the defense rested, the State called Detective Mosher in rebuttal. He recalled that defendant told him he checked three floors in response to the radio call regarding the screams before he went to the lobby. Negron also testified in rebuttal, denying that he left his post to get a cigarette for defendant.

After closing arguments, the trial judge found defendant guilty of two counts of home invasion and one count of armed violence, ruling that the two home invasion counts merged and that the remaining counts merged into the armed violence count. She sentenced defendant to 12 years in the custody of the Department of Corrections for each offense, the sentences to be served concurrently. She also denied defendant's motion for a new trial and he now appeals.

Defendant argues that the evidence presented at his trial was insufficient to find him guilty beyond a reasonable doubt. Specifically, he argues that Ernst did not have an adequate opportunity or the ability to observe her attacker, and that his conduct in returning to the scene of the offense was contrary to human nature if he were, in fact, guilty.

It is axiomatic that the State has the burden of proving the defendant guilty beyond a reasonable doubt, a burden that can be met with the testimony of a single, credible eyewitness. (*People v. Gibson* (1990), 205 Ill. App. 3d 361, 367, 562 N.E.2d 1142, 1145.) To constitute a positive identification, an eyewitness must have had an adequate opportunity to observe the offender (*People v. Brown* (1982), 110 Ill. App. 3d 1125, 1128, 443 N.E.2d 665, 667); however, there is no requirement that the observation take place under ideal circumstances or that it last for more than a brief period of time (*Gibson*, 205 Ill. App. 3d at 367, 562 N.E.2d at 1145; *People v. Milam* (1980), 80 Ill. App. 3d 245, 251, 399 N.E.2d 703, 707). The trier of fact determines

what weight to give identification testimony and that determination will not be subject to reversal on appeal "unless [it is] so contrary to the evidence as to be unjustified." *Milam*, 80 Ill. App. 3d at 251, 399 N.E.2d at 707; see also *People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (in a bench trial, the trial judge determines the credibility of witnesses).

The test for determining whether an identification is reliable requires an examination of the totality of the circumstances focusing on several factors, including: (1) the witness' opportunity to observe the offender at the scene of the crime; (2) the witness' degree of attention at that time; (3) the accuracy of prior identifications; (4) the level of certainty shown by the witness at the "identification confrontation"; and (5) the time span between the commission of the crime and the confrontation. (*Slim*, 127 Ill. 2d at 307-08, 537 N.E.2d at 319; *Brown*, 110 Ill. App. 3d at 1128, 443 N.E.2d at 667, citing *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) Moreover, identification testimony is "strengthened to the extent of [the witness'] prior acquaintance with the accused." *Milam*, 80 Ill. App. 3d at 251, 399 N.E.2d at 707.

■ Application of the above factors to the case at bar supports the trial judge's conclusion that Ernst's identification of defendant was reliable. Ernst had adequate opportunity to view her attacker for about five minutes face-to-face from a distance of 10 to 12 inches. Although he wore a bag over his head, the trial judge's detailed description of it demonstrates that Ernst viewed a significant portion of her attacker's face. The judge stated:

> "[T]he left eye-hole is, I would guesstimate three and a half inches deep top to bottom with a flap running horizontally. But when it's fully opened, there is probably two and a half to maybe [*sic*] three inches of space.
>
> [The right eye-hole] is probably three-and-a-half inches [*sic*] long and at it's [*sic*] widest top to bottom measurement I would guess somewhere around an inch.
>
> * * *
>
> When I think about and look at the apertures in this paper [*sic*] bag, [Ernst's claim that she saw the side of defendant's face] seems not unreasonable to me."

The judge concluded that Ernst's recollection of seeing defendant's hair when she saw the side of his face through the bag was consistent with defendant's appearance, noting that he "has a very low hairline *** his hairline on the side of his face is extraordinarily close to his eyebrow." Ernst was obviously very attentive during the attack as revealed by her detailed account of it, and by her observation of her

attacker's clothing, including the tightness of his uniform shirt. Just minutes after being attacked, Ernst told her neighbor, Glennon, that she recognized her attacker as one of the building's maintenance men. She positively identified defendant a short time later in the hallway and again in court.

We accordingly hold that Ernst's unwavering identification was supported by the evidence and is sufficient to sustain defendant's conviction. See *Brown*, 110 Ill. App. 3d at 1128, 443 N.E.2d at 666-67 (armed robbery victim provided a reliable identification of the defendant, even though he had been hit on the head and instructed not to look at his assailants, when his detailed description showed that he had been attentive and he picked the defendant out of a lineup only 36 hours after the crime); *Milam*, 80 Ill. App. 3d at 248, 251, 399 N.E.2d at 704-05, 707-08 (victim's identification of the defendant was reliable notwithstanding the fact that he saw him for only a "flash" from about 75 feet away); *People v. Wheatley* (1989), 183 Ill. App. 3d 590, 598, 539 N.E.2d 276, 280-81 (identification testimony of armed robbery victim was sufficiently reliable when the victim saw the defendant's face from within two feet under the light of a street lamp and in a lit doorway, was attentive, and described him with a "reasonable degree of accuracy"); but see *People v. Ford* (1990), 195 Ill. App. 3d 673, 676-78, 553 N.E.2d 33, 35-36 (police officer's identification testimony was vague and doubtful when he failed to note the defendant's severe facial scarring or the bandage he wore to cover it and his testimony contained several other discrepancies).

■ Defendant next asserts that he acted contrary to human nature if he were a guilty person when he returned to the twenty-first floor with Negron and did not flee. He cites *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, for the proposition that a reviewing court is not bound to believe a witness whose testimony contradicts human nature. (*Coulson*, 13 Ill. 2d at 297, 149 N.E.2d at 99.) In that case, the robbery victim testified that the five defendants took his wallet, drove him home, and waited outside while he went in to get more money for them, and accepted his assurance that he would not call the police. Our supreme court found that this testimony "taxe[d] the gullibility of the credulous." (*Coulson*, 13 Ill. 2d at 296, 149 N.E.2d at 99.) In contrast, in the case at bar, defendant's conduct can readily be viewed as quite consistent with human nature. Although consciousness of guilt can be inferred from flight, the converse, that failure to flee is indicative of innocence, is not a necessary corollary. (See *People v. Williams* (1976), 42 Ill. App. 3d 134, 137-38, 355 N.E. 2d 597, 600.) Defendant would not be the first criminal, nor will he be the last, to conduct himself as though he

were unaware of what happened, confident in the belief that he could thereby escape suspicion.

■ Defendant next catalogs a "variety of other reasons" why the evidence presented does not support a guilty verdict. He notes that he did not appear wet or disheveled shortly after the attack. However, the trial judge addressed this argument, inferring from Ernst's testimony that as she was standing directly under the shower head there could not have been a strong spray of water. The judge concluded that it was thus possible for defendant to have struggled with Ernst from outside the tub without getting his short-sleeved shirt or slacks wet. In the photograph of Ernst's tub (People's exhibit No. 6), it appeared to be about three-fourths full of water. The judge stated that she did not know when that picture was taken, but that the unrefuted testimony indicated that Ernst was "right up under the shower head" when attacked. Defendant also notes that the State failed to produce a weapon, but the trial judge concluded that he had ample time to dispose of the knife.

Our function as a reviewing court is not to retry the defendant, but rather to inquire whether " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Viewing the evidence in the light most favorable to the State, we cannot say that the trial judge's conclusions were so improbable that no rational trier of fact would have convicted defendant. We accordingly hold that defendant was found guilty beyond a reasonable doubt.

Defendant next argues that his armed violence conviction should be reversed because it was predicated upon the same physical act as his underlying home invasion conviction. He also contends that he should be resentenced, because the trial judge may have considered the armed violence count when sentencing him.

Well-established Illinois law prohibits convicting and sentencing a defendant for multiple crimes based upon the same physical act. (*E.g., People v. Jones* (1992), 234 Ill. App. 3d 1082, 1094, 601 N.E.2d 1080, 1088.) When convictions for armed violence and the underlying felony are both predicated upon the same physical act, judgment should be entered only on the more serious offense. (*People v. Donaldson* (1988), 91 Ill. 2d 164, 170, 435 N.E.2d 477, 479.) This "one-act-one-crime" rule was promulgated by our supreme court in the seminal case *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, where the court elucidated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense." (*King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45.) We have set forth relevant factors for a determination of whether the defendant's conduct constituted separate acts: (1) the time lapse between successive segments of the defendant's conduct; (2) whether an intervening event occurred; (3) the victim's identity; (4) the similarity of the defendant's acts; (5) the site of the defendant's conduct; and (6) prosecutorial intent as evinced in the language of the indictment or information. See *People v. Rodarte* (1989), 190 Ill. App. 3d 992, 1001, 547 N.E.2d 1256, 1261-62; *People v. Ellis* (1986), 143 Ill. App. 3d 892, 895-96, 493 N.E.2d 739, 742.

In the case at bar, the information charging defendant based one count of home invasion on his unauthorized entry into Ernst's dwelling place, knowing that one or more persons were present and his threatening the imminent use of force on Ernst while armed with a dangerous weapon, a knife. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(1) (now 720 ILCS 5/12—11(a)(1) (West 1993)).) The second count of home invasion was based upon defendant's unauthorized entry into Ernst's dwelling place knowing that one or more persons were present and intentionally injuring Ernst by "stabbing her about the body with a knife." (See Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(2) (now 720 ILCS 5/12—11(a)(2) (West 1993)).) The armed violence count alleged that defendant "while armed with a dangerous weapon, *** a knife *** intentionally and knowingly without legal justification caused great bodily harm to Christin Ernst by stabbing her about the body with a knife." (See Ill. Rev. Stat. 1989, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1993)).) The trial judge merged the two home invasion counts without stating which count she was entering judgment on. The State argues that defendant was convicted of home invasion based upon his initial act of threatening Ernst by grabbing her arm and that his armed violence conviction was based upon his actual stabbing of Ernst. Thus, according to the State, the two convictions were predicated upon distinct acts. We disagree.

We are mindful that the determination of what constitutes a physical act requires a detailed evaluation of the defendant's conduct

based upon the record as presented and that such fact-specific determinations intrinsically lack uniformity. (See *People v. Johnson* (1989), 128 Ill. 2d 253, 288-89, 538 N.E.2d 1118, 1133-34 (two gunshots fired at the victim interrupted by the shooting and robbery of a second victim constituted two physical acts); *People v. Mormon* (1982), 92 Ill. 2d 268, 269-70, 442 N.E.2d 250, 251 (convictions for rape and armed violence based on the rape were improper when they both arose from the same physical act); *People v.. Myers* (1981), 85 Ill. 2d 281, 288-89, 426 N.E.2d 535, 538 (finding two physical acts when the defendant stabbed his victim twice, but after the first stabbing threatened a second victim); *People v. Keefer* (1992), 229 Ill. App. 3d 582, 584, 593 N.E.2d 1109, 1110-11 (convictions for both aggravated battery and resisting a peace officer could not stand when both were based on the same physical act—one struggle); *People v. Ayala* (1990), 208 Ill. App. 3d 586, 601, 567 N.E.2d 450, 460 (two gunshots fired at the victim were two distinct acts when, in between the first and second shot, the victim fell, began to crawl away, and stopped to notice a gathering crowd); *People v. Hope* (1986), 142 Ill. App. 3d 171, 176, 491 N.E.2d 785, 788-89 (stabbing the victim four times in rapid succession without intervening events was one physical act); *People v. Ellis* (1986), 143 Ill. App. 3d 892, 897, 493 N.E.2d 739, 742-43 (defendant's conduct constituted one physical act when he punched the victim in the back of the head and neck and, after she turned around to face him, struck her in the nose); *People v. Gvojic* (1987), 160 Ill. App. 3d 1065, 1071, 513 N.E.2d 1083, 1087 (repeated stabbings of the victim's head, throat, chest, and limbs were one physical act in that they were all part of one attack).) Like *Keefer*, *Ellis*, and *Gvojic*, in the case at bar, we believe that the facts support the view that the attack on Ernst by defendant was one physical act. The entire encounter lasted about five minutes, no intervening event occurred, the incident took place in one location, and Ernst was the sole victim.

Additionally, although neither party refers to it, we find *People v. Govednik* (1986), 150 Ill. App. 3d 717, 502 N.E.2d 276, indistinguishable from the case at bar. There, the defendant was convicted of home invasion and armed violence based upon the intentional injury prong of the home invasion statute. (See Ill. Rev. Stat. 1983, ch. 38, par. 12—11(a)(2) (now 720 ILCS 5/12—11(a)(2) (West 1993)).) In that case, the hooded defendant made an unauthorized entry into a suburban home, threw a knapsack at the homeowner's son, and told him "you know what I want." The son then struck the defendant on the head with the knapsack, and during their subsequent struggle, the defendant stabbed the son. The boy's mother then entered the room and attempted to subdue the defendant until the police arrived. It

was clear in that case that the home invasion conviction was based upon the defendant's threat of force while armed with a dangerous weapon and that his armed violence conviction was based on his intentionally injuring the son. Referring to our previous holdings that the home invasion statute reflected legislative intent to impose only one count of home invasion for each unauthorized entry, we held that "to permit both of these convictions to stand would in effect allow the State to do indirectly what it cannot do directly, *i.e.*, convict defendant of two offenses of home invasion based on a single entry." (*Govednik*, 150 Ill. App. 3d at 725, 502 N.E.2d at 280-81.) We noted that the convictions appeared to be the result of "double dipping" by the State which was prohibited by the *King* court. *Govednik*, 150 Ill. App. 3d at 725, 502 N.E.2d at 281.

■ Similarly, in the case at bar, defendant made one unauthorized entry, briefly struggled with Ernst, and stabbed her before he fled. As in *Govednik*, we are reluctant to allow the State to indirectly obtain more than one home invasion conviction based on only one unlawful entry. The relevant elements of home invasion are: (1) an unauthorized entry into a dwelling place by a person who is not a peace officer acting in the line of duty and who knows or has reason to know that one or more persons is present; and (2) using or threatening force on any person within the dwelling while armed with a dangerous weapon; or (3) intentionally causing any injury to a person within the dwelling. (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a) (now 720 ILCS 5/12—11(a) (West 1993)).) We reiterate our previous holding that the plain meaning of the statute is that only one count of home invasion occurs with each unauthorized entry into a dwelling place. (*People v. Ammons* (1983), 120 Ill. App. 3d 855, 861, 458 N.E.2d 1031, 1036; accord *People v. Morrison* (1985), 137 Ill. App. 3d 171, 177-78, 484 N.E.2d 329, 335.) Such a construction of the statute comports with its express language and its purpose to protect persons within their homes. (See *Ammons*, 120 Ill. App. 3d at 861, 484 N.E.2d at 1036; see also *People v. Shelby* (1984), 123 Ill. App. 3d 153, 163, 462 N.E.2d 761, 768.) In the case at bar, the trial judge did not indicate which count of home invasion she entered judgment on, but that does not affect our decision because we adopt the reasoning of *Govednik* and find that defendant was in effect convicted of two counts of home invasion for a single unlawful entry. Consequently, we vacate defendant's armed violence conviction.

■ However, we do not find that resentencing is necessary in this case. A new sentencing hearing is not required when the record does not indicate that the trial judge was influenced by a subsequently vacated count. (*People v. Payne* (1983), 98 Ill. 2d 45, 57, 456 N.E.2d 44,

50; see also *People v. Monigan* (1990), 204 Ill. App. 3d 686, 690, 561 N.E.2d 1358, 1361; *People v. Combs* (1990), 206 Ill. App. 3d 217, 227-28, 563 N.E.2d 798, 805.) In the case at bar, the trial judge considered each of defendant's convictions separately. She considered mitigating factors, including defendant's demonstrated rehabilitation potential, his strong family ties, and supportive testimony from the prison chaplain. After commenting on the nature of the home invasion offense, she sentenced defendant to 12 years for that crime, eight years less than the State requested. She aptly observed that "[i]t was a nightmare ***. And what could hardly be any more vulnerable situation to be standing taking a shower and to be suddenly grappling with someone that is attacking you. *** [C]ertainly [this] is the kind of offense that repels society and repels this Court." Since the trial judge considered each offense separately and was obviously influenced by the "chilling picture that was drawn by the evidence in this trial" rather than by the number of counts defendant was convicted of, remandment for a new sentencing hearing is unnecessary. See *Combs,* 206 Ill. App. 3d at 228, 563 N.E.2d at 805 (holding that a new sentencing hearing was not required when vacating some, but not all, of the defendant's convictions after reviewing the circumstances of the crime and the trial judge's statement regarding its brutal character).

Based upon the foregoing, we affirm defendant's conviction and sentence for home invasion and vacate his conviction and sentence for armed violence.

Affirmed in part; vacated in part.

DiVITO, P.J., and HARTMAN, J., concur.